Heckescher v. Cooper.

---

## HECKESCHER, Appellant, v. COOPER.

**Division Two, April 2, 1907.**

1. **EJECTMENT: Adverse Possession.**   Adverse possession does not mean mere occupancy. The possession must be adverse to and in defiance of the true title; and although it be peaceable for twenty years, yet if it be not adverse to and inconsistent with the rights of the true owner, the occupant cannot claim the land by limitations.

2. ———: ———: **Claim of Ownership.**   One cannot enter upon land supposing it to be Government land and occupy it for years and afterwards when he finds it to belong to plaintiff, set up a claim of adverse possession, and by asserting that he always claimed to be the owner and thought he had as good a title as any body else and in that belief and claim had occupied it for twenty years, defeat the title owner.

Appeal from McDonald Circuit Court.—*Hon. Henry C. Pepper*, Judge.

REVERSED AND REMANDED (*with directions*).

*O. R. Puckett* and *George Hubbert* for appellant.

(1) Defendant's possession of the land, with the recognition that it was land of the Government or of another, did not afford basis for adverse claim; nor could the statute start to run without some unequivocal change of attitude, such as is not to be found in this case. Hunnewell v. Burchett, 152 Mo. 611; Stevenson v. Black, 168 Mo. 561; Comstock v. Eastwood, 108 Mo. 41. (2) There was no definitely marked out and ascertainable part of the premises to which defendant could have had any title under the Statute of Limitations. His claim was a nullity because of the uncertainty of its limits. (3) The character of his possession could never start the statute to run against the true owner. Baber v. Henderson, 156 Mo. 566; Hunnewell v. Adams, 153 Mo. 440.

FOX, P. J.—This cause is now pending in this court upon appeal from a judgment rendered in the McDonald Circuit Court in favor of the defendant. This was an action in ejectment for the recovery of section 25, in township 22, range 31 west. The petition is in the ordinary and usual form in cases of this character and there is no necessity for inserting it here. To this petition the defendant filed the following answer:

"Now, at this day comes Zach Cooper, the above-named defendant, and for answer to the petition of the plaintiff herein, denies each and every, all and singular the allegations in the said petition made and contained, except as hereinafter specifically and directly admitted.

"The defendant avers that he is now in the possession of the following described lands lying, being and situated in the county of McDonald and State of Missouri, to-wit:

"Beginning twenty-four rods west of the southwest corner of section twenty-five, township twenty-two

north, range thirty-one west of the fifth principal meridian, in the county of McDonald and State of Missouri, thence north sixteen and one-half degrees west, ten rods; thence north twenty-one and one-half degrees west, twenty-eight rods; thence north six degrees west, twenty rods and fourteen links; thence north sixty-three degrees west, fourteen rods; thence north twenty-three and one-half degrees west, thirty-two rods; thence north sixty-nine degrees west, eighteen rods; thence north thirty-five degrees west, eight rods; thence north sixty-three degrees west, four rods and eleven links; thence north thirty-eight and one-half degrees west, fourteen rods; thence north seventy-seven degrees west, twenty-four rods; thence north sixty-four degrees west, thirteen rods; thence north twenty-eight degrees west, sixteen rods; thence north twenty-five degrees east, sixteen rods; thence north forty-nine degrees west, five rods and fifteen links; thence south fifty-six degrees west, twenty rods; thence south seventy-five degrees west, eight rods; thence north seventy-three degrees west, seventeen rods; thence north fifty-seven degrees west, fourteen rods; thence north seventy-one and one-half degrees west, sixty rods; thence north fifty-nine degrees west, sixteen rods; thence south forty-seven degrees west, ten rods; thence south thirty-two degrees east, sixteen rods; thence south twenty-six and one-half degrees east, fifty-five rods; thence south seventy-one degrees east, twenty-three rods; thence south five and one-half degrees east, thirty-two rods; thence south eighty-four degrees east, forty-one rods; thence south thirty-six degrees east, eight rods; thence south fifty-four degrees east, fourteen rods; thence south fifty degrees east, fifty rods; thence south twenty and one-half degrees east, thirty-six rods; thence south sixteen degrees east, to the section line; thence along said line to place of beginning, containing in all sixty-

three and eighty-seven hundredths acres, more or less [except a strip, belt or parcel of land twenty-five feet wide and running entirely around the premises above described next to the line above indicated and within the enclosure formed by the lines above indicated and described.]

"And the defendant further avers that he has been in open, notorious, hostile, adverse, exclusive, uninterrupted, visible, actual and continuous possession of each and every part of the above described lands from the second day of March, eighteen hundred and eighty-four, until the present time, and during all and every part of that time has claimed to be and has been the absolute owner of said land in fee simple and has claimed the same hostile to and adversely to the pretentions of the plaintiff herein and his grantors and all persons whomsoever."

Upon the trial of this cause the plaintiff introduced a clear record title vesting title in him, commencing with letters-patent from the Government, dated November 29, 1870. There being no dispute as to the clear record title of the plaintiff to the land in controversy, we deem it unnecessary to set forth in detail the patent and deeds conveying the property. Plaintiff then rested his case and defendant introduced testimony as follows:

W. N. Lett testified, substantially: As deputy county surveyor I surveyed and platted the land in question and occupied by defendant in section 25, running the lines approximately with his crooked rail fence, surveyed lines being straighter than the fence; in some places running outside the fence and in others inside the fence. My plat does not represent the fence, in which there are many bends and turns; but the lines are so averaged, that about the same number of acres are in the survey as in the fence. He has had his fence there enclosing the field, house and stable, to my knowl-

edge, about eight years; it was spoken of in the neighborhood as Cooper's place on Granny's branch.   I saw nothing to distinguish it from other places occupied by squatters; never heard about any particular claim he set up to it; I deviated from the fence in making the survey and plat, both inside and outside, but the general run of the enclosure is approximately with the lines as surveyed and platted; the land I surveyed runs at an angle through the section and goes into eight of the forties, as the plat shows; extends about a mile diagonally, running from southeast to northwest direction generally, covering about 63.97 acres, but I can't tell how much land there is in any one of the forty acres Government tracts; cannot accurately describe the land inside the fence enclosure; it is very irregular; but I don't think I surveyed any line more than twenty-five feet outside the fence itself, but cannot be positive; part of my survey was where there was no fence, but where fence appeared to have been sometime before; I had to go by what seemed, and what I was told, as to what was and had been fenced.   The plat as made by this witness is hereto attached.

. Mart Cowan testified, substantially:   I assisted
the surveyor, Mr. Lett, in making the survey he has
platted and told about, and I know the way Cooper's
fence runs on this section twenty-five; know Cooper
has been there in possession nineteen or twenty years,
and had this land as a claim.   It is known as Cooper's,
but I have not heard of any particular title claimed
by him; don't know about the title; but he claimed the
land all the time, so far as I know; he was living on
it and cultivating and improving it; he never had any
sort of title to it that I know; he only claimed it as his
claim; lived there and used it as his home; I had an
idea he had the best right to it, better than anybody
else in the county as a claim; never heard Cooper say
anything about it.   As to the survey, the furtherest

distance at any point this survey ran outside of the fence was not over twenty steps—about twenty steps from the fence on the outside; possibly the distance deviated from the fence about sixty feet on a straight line; there was one place I suppose was twenty-five steps, it would not average over fifteen feet. I never knew of any change in the attitude of Cooper; his possession was always just the same.

Gus Cowan testified, substantially: I helped survey this land Cooper is on; he has lived there eighteen or nineteen years and does yet; I supposed it railroad land; he has about thirty-five acres cleared and under fence; a log house and a log barn; I reckon he claimed it as his own all the time; that's as far as I know. He never said what sort of claim he had; he just said it was his; he did not say how or what title; I guess he had as much right as any one; it is generally called railroad land; he claimed the improvements and had the land under fence.

Fred Wooley testified, substantially: I know this land where Cooper lives; has always been called Zach Cooper's place for eight or nine years, but never heard him say so.

Zach Cooper, defendant, testified, substantially: "Q. Tell the jury where you live. On this land in controversy? A. I got Mr. Lett to survey this land last August. I went on that land March 2, 1884; if I count right it will be twenty years the 2d day of March coming. When I first went there it was laying there in the woods, nothing only just a little strip of rocky hollow, and I can tell you my reason for going there. When I come to this country I had been blind eighteen months until I couldn't see to work, I wasn't able to buy a place and Charley Matterson had this place and another place and he says to me, 'If you want that place you can just go on it,' and I went on it and have been there ever since. So I went to work and cleared up

this land and have been there ever since, and never a man claimed that land or ever asked me to get off the land or nothing else, until this thing come up a year ago last spring, I think. Well, sir, I never have measured it any more than the surveyor. I went and got them men to survey my place, and I told him I want to know just what I had in cultivation, and want to survey it and get me a plat of what I had in cultivation, and he went to work and surveyed it and give me a plat of it, and he said there was sixty-three acres. I claimed to be the owner of the place.

"Q. How long have you claimed to be the owner of the place? A. I have claimed to be the owner of the place nineteen years the 2d day of March.

"Q. When did you first find out that was not Government land? A. I don't know whether I have found it out yet or not. I haven't been around trying to find out what kind of land it was.

"Q. And didn't you tell Mr. A. W. Noel that you went on there thinking it was Government land? A. No answer.

"Q. Do you know Mr. Noel? A. I don't know.

"Q. A. W. Noel? A. If I ever told anybody it was Government land I have forgot it.

"Q. What other title did you have? A. I just had a right and a title to that place; I was given the place by Charley Matterson, and I went on it and improved it when it was not worth ten dollars.

"Q. Charley who? A. Matterson.

"Q. Did he claim to own the land. A. He told me, he says, 'I have got a claim and will give it to you.'

"Q. You understood that was a claim to Government land? A. No, sir; he didn't say so. It has been a good while ago and I couldn't say what it was.

"Q. Been too long ago to tell? A. Yes, sir.

"Q. You didn't buy it from him? A. No, sir.

"Q. Didn't pay him anything? A. No, sir.

"Q. Didn't promise to pay him anything? A. No, sir.

"Q. You don't claim to have bought the land from him or anybody else? A. No, sir.

"Q. You simply thought because you was living there and improving that place and using the land, after so long it became yours? A. I thought I had the best right to it to anybody else.

"Q. What did you base that claim of right on? A. I had possession of it, and told you three or four times that Mr. Matterson gave it to me, then I went ahead and improved the place and put everything on the place that is on it, and I think I have got more right there than anybody else, and I think that entitles me to the land, and that is what my title is.

"Q. That is the land you have got fenced. A. Yes, sir.

"Q. That is what you had surveyed out there? A. Yes, sir..

"Q. You gave directions to the surveyor about where he should run his lines? A. I gave him directions. I told him to run them lines, that I wanted to know exactly what my improvements took in.

"Q. Did you see him make the lines? A. Yes, sir.

"Q. Did you see where he run the lines? A. Yes, sir; I was along with him most of the time, but I didn't have anything to do with the survey.

"Q. You had him testify here? A. Yes, sir.

"Q. And also heard his testimony? A. Yes, sir.

"Q. You heard the testimony of the man who carried the chain? A. Yes, sir.

"Q. They were correct about the way the lines run there with reference to the fence? A. Yes, sir; I guess they told it about as near as they could.

"Q. You have never listed this land for taxes or paid taxes on it. A. No, sir.

"Q. Never did at any time? A. No, sir.

"Q. How about this conversation with Mr. Puckett? A. Well, sir, I will tell you all the conversation Puckett and I ever had about the land, as far as I know. Mr. Puckett come to me when I was first notified, and they read the summons to me to attend court; and it seems to me . . . I don't know anything . . . I don't know much at best; but I says to him, I says, 'If I was on your land,' says I, 'why didn't you tell me or come and notify me something about it, why sue me?' And he says, 'We wanted to perfect the title,' and he didn't want possession; and he says, 'There is such a law, if a man stays on a piece of land, and is in peaceable possession ten years, it gives title to the land.' He was the man that told me about that law of ten years giving me a title to the land.

"Q. What do you know about this statement to W. E. Smith about it being Government land? A. Well, sir, I talked with Smith lots of times, first about one thing and then another; what I said to Smith about the Government land, I don't know anything about it. The way the lines run and the way they are cut up there, I didn't know how the lines run. I just fenced along the branch the best I could to get a little piece of land, and there was part of my fence that run off onto Government land, and there was eight or ten acres above where this survey was made that is on Government land, I suppose.

"Q. Up to the time this answer was filed, January a year ago, had you ever had this land surveyed up to this time? A. No, sir, I never had. I did not know where the line was.

"Q. You never had heard the land described at that time? A. No, sir, I hadn't; I didn't know what land it was, so far as that was concerned."

Here the defendant rested his case in chief.
Whereupon the plaintiff offered the following instruc-
tion in the nature of a demurrer to the evidence of
defendant:

"The court instructs the jury that the defendant
has not proved occupancy of any particular and definite
part of the land in question, susceptible of designation
and survey; that the documents in evidence establish
paper title in the plaintiff, and the finding must be for
the plaintiff."

Which demurrer was by the court overruled and in-
struction refused. To which action and ruling of the
court in overruling said demurrer the plaintiff then and
there objected and excepted at the time.

Plaintiff introduced further testimony as follows:
O. R. Puckett testified: "Q. Tell the jury what, if any,
conversation you had with the defendant in this case
with regard to ownership or title to this land in con-
troversy or any of it. A. Prior to the institution of
this suit, as representative of the plaintiff in this case
I called on Mr. Cooper, in company with Joe Edwards,
at the time he served the summons in a prior proceed-
ing involving this same controversy, and I asked Mr.
Cooper in regard to the nature of his claim, and he told
me that Mr. Wadkins, who has represented the plain-
tiff as local agent here, had approached him concerning
the land and his occupancy of it; and I asked with refer-
ence to leasing the land, and he said he gave Mr. Wad-
kins no positive reply in regard to his intention; and
since he had talked with Mr. Wadkins he had made
some inquiry around and had been informed that ten
years' possession of land gave him title, and he didn't
believe we could get possession, in view of the fact he
had been in possession of it for ten years or more; and
for that reason he refused to take a lease. I asked him
how he came to get in possession of it and he said he
merely moved onto it; it was vacant land, unoccupied

land; thought it was Government land at the time; but said after he had been on there awhile he heard it was railroad land; and he also said he heard among his neighbors that there was some litigation between the railroad company and the Congress of the United States, and that he understood the railroad had procured the land by fraud, and he didn't know but what, in the course of those proceedings, the title of the railroad company would be voided by Congress, and, if so, the land would revert back to the Government, and he expected to enter it as his homestead. I had two or three talks with him of the same import. This was in December at his home on this land."

A. W. Noel testified: "Q. Do you remember having had a conversation with Mr. Cooper at or about the bringing of this litigation between him and the legal owner of this land, concerning the title and the character of his possession of it? A. I heard him talking. I didn't do any of the talking; he was not talking to me. Q. Who was he talking to? A. Judge Smith. Q. You heard the statement? A. Yes, sir. Q. Tell the jury the language as near as you can? A. The substance of it was he went on there thinking it was Government land."

Charles Matterson testified:

"Q. Where do you live? A. State of Missouri, county of McDonald.

"Q. Where do you live with reference to the place now occupied by Zach Cooper. A. It was about a mile and a quarter north.

"Q. You are well acquainted with Zach Cooper? A. Yes, sir.

"Q. Do you know when Cooper took possession of the land he now occupies? A. I remember the fact of his taking possession of it. It was about twenty years ago.

"Q. You remember the fact of his taking possession of it? A. Yes, sir.

"Q. State under what circumstances, and what conversation you had with him at the time? A. To the best of my recollection it was about that time. I laid the foundation for the house on the place at first myself, then went and found me a piece of Government land to homestead, to make me a home out of it, and I run the sections there the best I could and I supposed it to be railroad land. There was a general talk all over the whole country that it was railroad land, every odd section, and the way the sections run I took it to be an odd section.

"Q. What did Zach Cooper say to you about it at that time? A. He settled on the place up there.

"Q. How come him to settle on the place? A. He had to leave the place where he was living, and he was out of a home, and he just moved up there I suppose and took a claim on the land.

"Q. What conversation did you have with him just before he moved on the place? A. I told him if he wanted to move on the claim, that I would just give him all the right and title I had to it and make him a quitclaim deed to it.

"Q. What right and title did you tell him you had? A. I told him I didn't have any right to it.

"Q. What else did you tell him about the title at that time. A. I told him I understood it was railroad land; that was the general talk of mighty near all the people, that every odd section was railroad land throughout the county, and that was section twenty-five, the best I recollect about it.

"Q. And Zach Cooper has been living there ever since? A. Yes, sir.

"Q. What has been the general talk throughout the neighborhood with reference to the title of the land during the time Zach Cooper had been living on it,

as to its being Zach Cooper's land or railroad land? A. Some says it is railroad land and some says it is Cooper's land, so it was kind of mixed; a good many said he had lived on it long enough with peaceable possession of the land that it give him title to the land.

"Q. That is the reason they say it is Zach Cooper's now? A. Yes, sir; because he has had possession so long.

"Q. That is the general talk about the character of his title? A. Yes, sir.

### CROSS-EXAMINATION.

"Q. You told Mr. Cooper what right, title and interest you had in it you would turn over to him and make him a quitclaim deed any time he wanted it? A. No, sir; I didn't say any time; I said I could make him a quitclaim deed to it; I didn't have any title at all; the land didn't belong to me. I laid the foundation for a house.

"Q. You offered to make him a quitclaim deed to it if he wanted it? A. I said I could make him a quitclaim deed of it, but I didn't have no title to it or no claim on it any more.

"Q. From that time? A. Yes, sir.

"Q. You didn't have any surveyor with you or anything of that kind? A. No, sir.

"Q. You don't know whether you had the lines right or not? A. I wasn't over there when Mr. Cooper had it surveyed.

"Q. He has lived on it about twenty years? A. Yes, sir; twenty years the 2d day of March.

"Q. He has claimed that land ever since that time? A. Yes, sir.

"Q. His possession of it has been open and notorious, and he has cultivated it and claimed it as his

own? A. He has cleared it up and cultivated it every year.

"Q. He was there in open possession where everybody knew where he was and what he was claiming, so far as you know? A. Yes, sir.

"Q. By you telling him you had no title to it you meant you had no deed to it? A. No, sir; no deed to it at all.

"By Mr. Puckett: Q. And no claim to ownership? A. No, sir; no claim to it at all."

Again at the close of all the evidence the plaintiff in effect requested the court to instruct the jury to find the issues for the plaintiff, which was again denied by the court, to which action of the court the plaintiff then and there objected and excepted at the time.

At the close of the evidence the court instructed the jury; however, we deem it unnecessary, with the views we entertain upon the testimony in this cause, to reproduce such instructions. The cause being submitted to the jury upon the evidence and instructions of the court they returned a verdict finding the issues for the defendant as to the land particularly described in the answer of the defendant. Upon this verdict the court rendered a judgment in which it was adjudged that the defendant have and recover and hold the premises as heretofore described in the answer. Timely motions for new trial and in arrest of judgment were duly filed and by the court overruled, and from the judgment rendered in this cause the plaintiff prosecuted this appeal and the record is now before us for review.

OPINION.

It is manifest from the record in this cause that there is but one legal proposition for our consideration, that is as to the sufficiency of the testimony introduced by the defendant to authorize the court to submit the

issues of the Statute of Limitations to the jury. That the plaintiff was the owner and had a clear record title to the land in dispute there can be no question, and unless there was substantial evidence tending to show that the defendant was holding the land adversely to the true owner and everybody else for the statutory period, then clearly it was the duty of the court to have directed the jury to find the issues for the plaintiff. The law upon the subject of adverse possession is nowhere more clearly stated than in Hunnewell v. Burchett, 152 Mo. 611. It was there said by this court, speaking through BURGESS, J., that "the law . . . presumes that every possession is rightful and consistent with, not in opposition or 'adverse' to, title and ownership. A party, therefore, who relies upon 'adverse possession,' in order to rebut this presumption of possession consistent with the title of the real owner, must prove his possession to be 'adverse' to the title set up (Jackson v. Sharp, 9 Johns. 163; Ld. Raym. 329); that is, he must show the actual knowledge of the real owner that he claims in opposition to, and defiance of, his title, or he must show such an occupancy and user, so open and notorious, and inconsistent with, as well as injurious to, the rights of the true owner, that the law will authorize, from such facts, the presumption of such knowledge by the true owner. It is not the mere occupancy or possession which must be known to the true owner, to prejudice his rights; but its 'adverse character.' [Alexander v. Polk, 39 Miss. 1. c. 755.]" The rule announced in that case was approved and followed in the recent case of Missouri Lumber & Mining Co. v. Jewell, 200 Mo. 707.

We have read in detail all of the testimony introduced respecting the claim and possession of the defendant to the land in controversy and have fully set forth such testimony in the statement of this cause, and we deem it sufficient to say upon this proposition

that the testimony absolutely fails to show such a state of facts as would authorize this court to hold that the defendant had acquired title to any part of the land in controversy by reason of the running of the Statute of Limitations. We are unwilling, confronted with the facts disclosed in this record, to hold that the defendant had acquired title to this land; to do so, in our opinion, would be to extend the rules of law applicable to that subject, and encourage parties who have no claim whatever upon lands belonging to others, to adopt methods of acquiring title that cannot be justified either upon moral grounds or upon sound legal or equitable principles. The defendant in this cause testified in his own behalf, and when all of his testimony is considered and measured by the rule as announced in Hunnewell v. Burchett, supra, it absolutely fails to make out such a case of adverse possession as to defeat a recovery by the true owner of the land. His testimony when boiled down amounts to about this: He says, "I thought I had the best right to it to anybody else," and that he thought he had more right there than anybody else, and that he thought that entitled him to the land, and he finally says, "that is what my title is." He further testified that up to the time the answer was filed in this cause he had never had the land occupied by him surveyed; that he didn't know where the lines were; and to the question as to whether or not he had ever heard the land described at that time, he answered, "No, sir, I hadn't; I didn't know what land it was, so far as that was concerned." The record further discloses that he never pretended to have this land listed on the assessment books, and had never paid any taxes upon it.

We see no necessity for extending the discussion of this question any further. We are unwilling to further extend the rule respecting the Statute of Limitations and announce under the testimony of the defend-

ant himself that he had acquired title to this property. This conclusion is reached without considering the testimony offered by the plaintiff upon this subject, which clearly indicates that the defendant regarded this land as Government land; at least, witnesses testify respecting conversations with him in which he said that he thought it was Government land, and while the defendant has no recollection of any such conversation, he by no means undertakes to deny that he had them.

The judgment in this cause should be reversed and the cause remanded with directions that the circuit court enter a judgment for the plaintiff for the recovery of the land in dispute, and it is so ordered.

All concur.