JOSEPHINE BURNSIDE and COMMERCE TRUST COMPANY, Appellants,
v. WALTER P. DOOLITTLE and MABEL B. DOOLITTLE.—24 S. W.
(2d) 1011.

Division Two, February 19, 1930.

Joseph S. Rust and James H. Cravens for appellant Josephine Burnside; Cooper, Neel, Kemp & Sutherland for appellant Commerce Trust Company.

E. McD. Colvin and Howard W. Grant for respondents.

724

COOLEY, C.—Josephine Burnside as plaintiff filed suit in the Circuit Court of Jackson County against defendants, Walter P. Doolittle and Mabel B. Doolittle, to determine title to certain real estate alleged by her to have belonged to her deceased husband and for an accounting for rents. The Commerce Trust Company was permitted to and did file an intervening petition also asserting title in plaintiff's deceased husband. From a judgment in favor of defendants and dismissing plaintiff's and intervener's petitions plaintiff and intervener appeal.

Plaintiff is the widow, and defendant Mabel Doolittle is the daughter by a former marriage and the only child and heir, of Samuel G. Burnside, who died intestate in December, 1925. Walter Doolittle is the husband of his co-defendant.

Plaintiff's petition alleges that she is the widow of Samuel G. Burnside and as such widow has an interest in the real estate left by him, and that said Burnside "died seized and possessed of the following described real estate." Then follows a description of ten parcels of real estate, numbered "a" to "j" inclusive, the first eight being in Kansas City, Missouri, and the last two in the Isle of Pines off the coast of Cuba, and an allegation that defendants

are in possession and claiming to be owners thereof and collecting the rents. There then follows, in paragraph 5 of the petition, an allegation that said Burnside "also died seized and possessed of" three described parcels of real estate, two in Kansas City and one in Jackson County, with the further allegation that defendants, though not claiming title, have collected rents on said three parcels since Burnside's death and failed to account therefor.

Intervener's petition in like language alleges that Burnside "died seized and possessed" of the ten parcels of property first above mentioned; that he also died "seized and possessed" of the three parcels described in paragraph 5 of plaintiff's petition, with further allegations to the effect that at the time of his death he was indebted to intervener and that said claim of intervener had been duly allowed in the probate court against Burnside's estate in the sum of $37,002.70; that said indebtedness had been secured by deed of trust on the three parcels of property described in paragraph 5, which deed of trust had been foreclosed and the property bought at the foreclosure sale by intervener for $15,000, which amount, less costs of foreclosure, had been credited on the debt, and that there were no assets in the estate out of which to pay the balance of the debt other than the ten parcels of real estate in controversy.

The prayer of plaintiff's petition for an accounting for rents dropped out of the case in the trial, so that the case resolves itself into an action to determine title to the ten parcels of property first above mentioned. Defendants by their answers deny that Burnside died seized and possessed of said ten parcels of real estate and aver that "the fee simple title to said real estate has been for many years and now is vested in defendants and that plaintiff has no interest therein."

It was admitted at the trial that the record title to the three parcels of property described in paragraph 5 of plaintiff's petition stood in the name of Samuel G. Burnside and that he owned same; also it was conceded by plaintiff and intervener that the record title to the ten parcels in dispute was in defendant Mabel B. Doolittle and had been for a number of years prior to Mr. Burnside's death, although it is not shown by pleadings or evidence when or from whom she acquired the title, nor by what kind of conveyances. The trial court and the petitioners seem to have assumed that she acquired the title prior to the marriage of her father and plaintiff, although there is no evidence so showing.

Plaintiff and intervener presented their cases together as though both were plaintiffs. The case was tried below by all parties as a suit in equity, wherefore we may so treat it on this appeal.

In their petitions the petitioners allege that Mr. Burnside "died seized and possessed" of the property, seemingly asserting legal title

in him; but in their briefs in this court they contend that the evidence shows "equitable ownership" in him. There is no claim of fraud. There is neither allegation nor proof that Mabel Doolittle held the title in trust for her father, nor of any facts from which a trust could result. Neither is there allegation or proof tending to show a parol gift by Mrs. Doolittle to her father. There being no evidence to the contrary, it must be assumed that when Mrs. Doolittle acquired the record title she became and was the real owner. Petitioners do not suggest how that ownership passed from her to her father unless it be through adverse possession by the latter. They say in their reply brief that "there are other methods of acquiring title to real estate than the three methods enumerated" (viz., 1, by way of a trust; 2, by a parol gift; 3, by adverse possession). But they do not suggest what such other methods may be, nor is there any such suggestion in their pleadings or evidence. We need not speculate as to how Mr. Burnside *might* have acquired the title or become the owner. Petitioners assert, contrary to the record title and the ownership indicated thereby, that Mr. Burnside owned the property at his death. The burden was upon them to prove it. While not specifically resting their claim of such ownership upon acquisition of title by adverse possession, petitioners' briefs seem to invoke that theory.

Petitioners offered three witnesses, the plaintiff, one Mrs. Braudigan, plaintiff's daughter by a former marriage, and one of plaintiff's attorneys. The latter testified only as to the value and rental value of the properties in controversy.

The plaintiff testified that she and Mr. Burnside were married in March, 1906, and from that time until Mr. Burnside's death they lived at 1118 Bellefontaine Avenue, Kansas City, Missouri, one of the properties in controversy, without paying rent to Mrs. Doolittle; that after her marriage to Mr. Burnside he collected the rents from the properties in controversy except when he was away, at which times the Doolittles collected the rents, both on these properties and the properties standing in Burnside's name; that she knew nothing about what Mr. Burnside did with the rent money he collected from the properties involved herein, whether or not he was collecting it for Mrs. Doolittle or whether or not he accounted to her for it; that after their marriage she and Mr. Burnside took occasional trips, about one each year, for at least the next five years, being gone generally two months or so, during which times the Doolittles collected the rents and looked after the properties; that Mrs. Doolittle was married about 1903 and she and her husband and Mr. Burnside lived together at 1118 Bellefontaine Avenue until plaintiff and Burnside married, when the Doolittles moved to 1112 Bellefontaine Avenue where they lived for a year or so before moving to 1114 Bellefon-

taine Avenue where they lived, she thought, for about three years, both the latter properties being now in controversy; that she did not know whether the Doolittles paid rent for No. 1112 but that they did for No. 1114; that she did not know why or under what arrangements Mr. Doolittle paid rent for 1114 Bellefontaine Avenue: ''I was never taken into any of their affairs. It was all between themselves. I knew nothing about it.''

Plaintiff testified that her knowledge relative to Mr. Burnside's collection of rents was based upon trips she would occasionally make with him, ''several times during the year,'' when he would drive around in his buggy and collect rents from different tenants, though she mentioned no particular properties on which he so collected rent. She was then asked whether or not Mr. Burnside claimed to her that he owned ''that property,'' to which defendants objected. After some colloquy the court overruled the objection, whereupon the question was repeated and answered thus: ''Q. During all of that time did you go around and collect the rents? Did you go around with him in collecting the rents and did he claim to own that property? A. Yes, sir. Q. What did he say about the property? The gentlemen say they want me to ask you what he said? A. He would not say very much, except that he would drive along. He would say: 'This belongs to me,' and, 'This is my property.' '' She further testified in this connection that in 1905, before she and Mr. Burnside were married and at a time when it was not shown that Burnside was collecting rents thereon or in possession, he pointed out to her several specific properties which he then claimed to her he owned. They do not include all the properties in controversy. One at least, Burnside Hall, is not one of the properties claimed by defendants, and from the vague description given by plaintiff it is difficult to tell as to others whether they are properties here in controversy or not.

Relative to the Isle of Pines property the only evidence offered by petitioners was this testimony by plaintiff:

''Q. Now, do you know anything about any claim with reference to the Isle of Pines property, this Hotel Burnside, in the Isle of Pines? A. Well, he bought the property while we were down there on a trip, and that was in 1911.

''Q. Can you state anything about the furnishings of the hotel there? A. Well, we selected some of the furnishings at Emery-Bird's, Mr. Burnside and I, and the dishes and rugs and some bedding.

''Q. About what time was that that you selected those furnishings? A. It must have been in 1911 or 1912.''

She further stated that Mr. Burnside paid for those furnishings, but admitted on cross-examination that all she knew about that was

hearing Mr. Burnside say he had done so, and that he did not state whose money he used. At that time, it appears from her testimony, the Doolittles were in the Isle of Pines. She testified they were there about eight years and "came home" in the spring of 1918.

Relative to payment of taxes and making repairs on the property, plaintiff was asked on direct examination: "Then who, during the time that you lived with Mr. Burnside, looked after the repairs and paid the taxes on that property?" To which she replied: "Mr. Burnside." But she admitted on cross-examination that if he did so she did not know whether it was done out of money he had collected as rent from the properties or not, nor on whose account he paid it. And on this subject later, on redirect examination, a significant occurrence took place. Plaintiff was being questioned about a tin box which she said she had seen about the house and which it was intimated might have contained papers, though witness said she did not know whether there was anything in it or not. The time referred to was about May, 1925, when it was shown that Mr. Burnside was taken to a Soldiers' Home, whence he never returned, Mr. Doolittle from that time on taking over the collection of rents and management of the properties, both those in controversy and those standing in Burnside's name. Defendants' counsel objected to the question about the tin box and the court intimated that he could not see the relevancy of it, whereupon this followed:

"MR. RUST, Counsel for Plaintiff: Only it might be argued here why didn't you show—what did you do with your tax receipts? That would be a matter of argument, and we want to show why we haven't anything, about showing who paid these taxes.

"MR. COLVIN, Counsel for Defendants: For the information of Mr. Rust I will say that we have the tax receipts, because we paid them. I have them here and they are in the name of Mabel Doolittle.

"MR. RUST: And the receipts for the improvements on the property and various things of that kind?

"MR. COLVIN: Yes, sir. We will show you that we paid for the improvements.

"MR. SUTHERLAND, Counsel for Intervener: Do you have the tax receipts for the three properties that stood in Mr. Burnside's name?

"MR. COLVIN: No, sir: we have not."

Petitioners did not ask for the receipts, nor attempt to have them offered in evidence, seemingly conceding the truth of what defendants' attorney thus in open court stated they showed. It is not shown that petitioners made any effort to produce or have produced any written or record evidence relative to the ownership or management of the properties. Further, as showing the relations between father and daughter, plaintiff had previously testified that the Doolittles had a key to the property in which plaintiff and her hus-

band lived; "most always let them have a key;" that when living near Mr. Doolittle would come over and look after the furnace for the Burnsides and that "Mr. Burnside depended on him to do a great deal of the repairing around the house."

There was no showing that the fact that Mr. Burnside claimed to own the properties now in dispute, if he did so claim, was communicated or made known to defendants or either of them, unless knowledge thereof is to be presumed from the fact of his collecting the rents as above stated. It is not shown who rented the properties, that is, who did the letting.

Mrs. Braudigan, plaintiff's daughter, testified that about a month after her mother's marriage to Mr. Burnside, in 1906, she visited her mother and that during that visit Mrs. Doolittle took her out for a drive and pointed out different properties as belonging to her father, saying as they went along: "This is papa's," or, "this belongs to papa." She designated four or five and said there were others she could not remember. One, Burnside Hall, was a property which admittedly was never claimed by defendants. One of the properties in dispute, a small place adjoining Burnside Hall, Mrs. Braudigan said, was not pointed out to her by Mrs. Doolittle as Mr. Burnside's property. Of the others pointed out the description given by the witness was somewhat vague. It is not clear from her description that they were properties in controversy, though they probably were. She had been taken around and shown the properties in controversy a few days before the trial (which was in March, 1927) by plaintiff and one of plaintiff's attorneys, to see if she could identify them, but could only identify those mentioned. Neither plaintiff nor the attorney testified that the properties shown the witness were properties in controversy.

There was some evidence tending to show that after their return from the Isle of Pines and about January, 1919, the Doolittles were for a time, how long is not shown, in straitened financial circumstances and that Mrs. Doolittle said her father was unkind and did not help them. Plaintiff's attorney testified that the rental value of all the properties in dispute was about $600 per month, net, if all were kept rented, but there was no evidence as to how much of the time they were kept rented.

When plaintiff and intervener rested their case the court announced that he deemed the evidence insufficient to sustain the allegations of the petitions and that the judgment would be against plaintiff and intervener. Thereupon intervener asked to have the record show the facts pleaded by it relative to the foreclosure of the deed of trust held by it on the properties of Mr. Burnside covered by that instrument and the allowance of its demand against Mr. Burnside's estate, which facts were admitted. The court then re-

marked: "I think I had better mark this given," and "thereupon the court marked 'Given' a declaration of law offered by the defendants, in words and figures following, to-wit: 'The court declares the law to be that under the evidence of the plaintiff and intervener, the judgment of the court must be in favor of the defendants.' "

Plaintiff then offered her written election to take a child's part in the estate of Samuel G. Burnside in lieu of dower, which was rejected on the ground that it was not properly acknowledged, and judgment was entered for defendants.

The evidence fails to sustain petitioners' claim that Mr. Burnside paid the taxes and paid for improvements and repairs. It is true plaintiff so stated in answer to a question by her attorney. But even if her statement was based on anything more than hearsay or conclusion, which is doubtful, she did not claim to know whether he paid such items for and on behalf of his daughter out of moneys he had collected as rentals on the properties or whether he did so as owner. And in any event her bare statement that Mr. Burnside paid those items, in view of what subsequently occurred in the trial relative to that question, cannot be regarded as proof. As shown above, it developed that the receipts showing such payments and in whose name they were made were in defendants' possession and in the court room and were virtually tendered to plaintiff's counsel. All plaintiff or intervener had to do was to ask for them and offer them in evidence if they desired the court to see them. This they did not do, but seemingly accepted the statement of defendants' attorney that the receipts showed payment of said items by defendant Mabel Doolittle. If such conduct did not amount to an admission that the receipts showed what defendants' attorney stated they showed, it at least authorized an inference that the receipts, if offered in evidence, would have been unfavorable to petitioners' cause.

"Where it is apparent that a party has the power to produce evidence of a more explicit, direct and satisfactory character than that which he does introduce and relies on, it may be presumed that if the more satisfactory evidence had been given it would have been detrimental to him and would have laid open deficiencies in, and objections to, his case which the more obscure and uncertain evidence did not disclose." [22 C. J. sec. 55, p. 115, and cases cited in note. See also, 22 C. J. sec. 53, p. 111; Ibid, sec. 54, p. 113; Bent v. Lewis, 88 Mo. 462.]

Neither do we think the collection of rents, under the circumstances, sufficient to show adverse possession on the part of Mr. Burnside. Mrs. Doolittle was his only child. The evidence does not show that their relations toward each other were unfriendly. Except for

one petulant act attributed to her, no doubt done in such temporary vexation as may occur in the most affectionate family, there is nothing to indicate that the feeling between them was other than that of the love and confidence characteristic of the relationship of father and daughter. Nor is there any intimation of unfriendliness between Mr. Burnside and his son-in-law. We gather from the evidence that he must have retired from active business prior to his marriage to plaintiff and may have desired to occupy himself part of the time in looking after and collecting rents from these properties for his daughter, whose husband, it appears, was employed. While the Doolittles were at the Isle of Pines, from about 1911 to 1918, it would be very natural for the father to attend to those matters for his daughter. If adverse possession shown by collection of rents prior to that absence of defendants is relied upon its continuity was broken at least once each year when Mr. and Mrs. Burnside were away on trips and defendants collected the rents. Furthermore, as stated above, there is no showing as to what Burnside did with the rents he collected or that there was not some friendly arrangement or understanding between father and daughter concerning the whole matter. The same is true concerning the occupancy by Mr. and Mrs. Burnside of the residence at 1118 Bellefontaine Avenue after their marriage.

In all these matters it must be borne in mind that the parties were father and daughter, not strangers in blood who would naturally be presumed to be dealing with each other on a strictly business basis. It is true plaintiff testified that Burnside "claimed to own the property," designating some of them, though in rather a vague and unsatisfactory way. But, as stated above, there is no attempt to show that such claim, if made, was ever communicated or brought home to defendants.

Appellants cite cases in support of their contention that possession which is adverse and also known to the other party is equivalent to possession which is adverse and also open and notorious. That is true. The law requires adverse possession to be open and notorious in order to notify the real owner of the possession and claim of disseizin. If the owner had actual knowledge of the adverse possession and claim, openness and notoriety become unimportant. [Dausch v. Crane, 109 Mo. 323, 336-7, 19 S. W. 61.] But it is not the mere occupancy or possession of land which must be known to the true owner in order to prejudice his rights, but its adverse character.

"The law . . . presumes that every possession is rightful and consistent with, not in opposition or 'adverse' to, title and ownership. A party, therefore, who relies upon 'adverse possession,' in order to rebut this presumption of possession consistent with the title of the real owner, must prove his possession to be 'adverse' to

the title set up (Jackson v. Sharp, 9 Johns. 163; Ld. Raym. 329); that is, he must show the actual knowledge of the real owner that he claims in opposition to, and defiance of, his title, or he must show such an occupancy and user, so open and notorious, and inconsistent with, as well as injurious to, the rights of the true owner, that the law will authorize, from such facts, the presumption of such knowledge by the true owner.'' [Heckescher v. Cooper, 203 Mo. 278, 293, 101 S. W. 658, quoting from Hunnewell v. Burchett, 152 Mo. 611, 54 S. W. 487.]

''Neither adverse claim without possession, nor possession without adverse claim, could start or keep the statute running.'' [Norton v. Kowazek, 193 S. W. 556, 559.] See also Spicer v. Spicer, 249 Mo. 582, 597, 155 S. W. 832; Lumber Co. v. Craig, 248 Mo. 319, 330, 154 S. W. 73; McCune v. Goodwillie (Mo.), 102 S. W. 997, 1006.

Appellants place much reliance upon the testimony of plaintiff that Mr. Doolittle paid rent for some three years on the property numbered 1114 Bellefontaine Avenue, and upon Mrs. Braudigan's testimony that Mrs. Doolittle, in 1906, pointed out certain of the properties in controversy as belonging to her father. Of the latter testimony, appellants insist that Mrs. Doolittle's failure to take the stand and deny the statement attributed to her amounts to an admission in terms that she made the statement as testified to by the witness. Decisions are cited in support of the contention. They are cases in which the party charged to have made statements testified and failed to deny the statements attributed to him. Even if the rule be as it is thus broadly stated, it should not be so applied under the circumstances of this case. By the action of the court indicating, immediately upon petitioners' resting of their case, that he deemed the evidence insufficient and would find for defendants, the defendants were relieved from the necessity of offering evidence. From the recitals of appellants' abstract of record it seems that that indication of the court's views was given before defendants had tendered their demurrer. But whether that is true or not, and notwithstanding a demurrer to the evidence has no place in an equity case, the court's action rendered it unnecessary for defendants to produce evidence or to explain things that would have justified an unfavorable inference against them had they been required to come forward with evidence and failed to explain. They might have asked leave to offer evidence, notwithstanding the court indicated he was ready to decide in their favor without it, but we do not think unfavorable inferences should be drawn against them because they did not do so.

In 22 Corpus Juris, Section 53, page 112, it is said that ''where defendant introduces no evidence but submits the case on plaintiff's evidence, no presumption unfavorable to defendant arises from his

failure to produce evidence peculiarly within his knowledge and possession,'' and in Section 57, page 123, that ''where the party upon whom the burden of proof rests has failed to make out a prima-facie case, the failure of the adverse party to testify raises no unfavorable inference against him.'' [See also, 22 C. J. sec. 56, p. 120, note 12.]

It may be observed further with reference to Mrs. Braudigan's testimony and also the unexplained payment of rent on one property by Mr. Doolittle, that it is not shown when Mrs. Doolittle acquired those properties. It could have been at a later time so far as the evidence shows. Or, if acquired before, there may have been some provision in the conveyance or otherwise whereby Mr. Burnside had certain rights during his life. True, there is no evidence to that effect and we cannot assume that such was the case. But petitioners admit the record title to be in defendant Mabel Doolittle and the burden rested upon them to prove either that Mr. Burnside was at all times the real owner or that he had, subsequent to the vesting of title and ownership in Mrs. Doolittle, acquired same from her. There was no attempt to show that Mrs. Doolittle originally took and held title for her father either by express or resulting trust. Casual statements testified to from memory some twenty-one years after the event cannot be regarded as sufficient to overthrow record titles to real estate. It is not claimed that Mr. Burnside had acquired title from Mrs. Doolittle by adverse possession in 1906, when, according to Mrs. Braudigan's testimony, Mrs. Doolittle pointed out to her certain properties as belonging to her father. No other method of acquisition by him of Mrs. Doolittle's title and ownership is suggested or can be considered because there is no evidence of any other. At least one of the properties which Mrs. Braudigan testified was pointed out, viz., Burnside Hall, did at that time belong to Mr. Burnside. She testified that Mrs. Doolittle did not point out one adjoining Burnside Hall which defendants owned and is here in controversy. Mr. Burnside may then have owned other properties which were pointed out and the witness when on the stand may have been confused on the question of identity. What properties Mr. Burnside may have owned and held record title to at that time or subsequently is not shown.

There is much concerning the question involved that the testimony leaves dark. Some things defendants might and should have explained had they been required to come forward with evidence, as for instance, the statement above discussed attributed to Mrs. Doolittle and the alleged payment of rent by Doolittle to Burnside; and on the other hand we think petitioners might have given us more light. For instance, the query suggests itself, why did not intervener require more security from Mr. Burnside for his debt to it, if he owned the properties here in dispute, since the security taken, as

the event proved, was so inadequate? But we cannot decide the case on speculation or conjecture. Admitting record title in defendants, petitioners had the burden of proving ownership, contrary to the record title, to be in Mr. Burnside. We think, as did the learned trial court, that they failed to produce evidence sufficient to justify a judgment in their favor. The judgment of the trial court is therefore affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All concur, except *Walker, J.,* absent.