# DULCE REALTY COMPANY v. STAED REALTY COMPANY, Appellant.

### Division Two, November 13, 1912.

1. **EASEMENT: Private Alley: Created by Deeds in Partition.** Deeds by cotenants in partition of land in a city block designating a certain plot of ground as a private alley left by all concerned, create an easement in the alley which passes in after conveyances with the estates to which it is appurtenant as long as the estates subsist as distinct estates in different proprietors.

2. ———: ———: **Estate of Abutting Proprietor.** In the absence of evidence to the contrary it will be presumed that the owners of property abutting on a private way hold the fee to the center of the way.

3. ———: ———: **Acquired by Deed: Not Lost by Nonuser.** An easement acquired by deed cannot be lost by mere nonuser.

4. ———: ———: ———: ———: **Evidence.** This is a suit to enjoin the construction of a building on an alleged private alley and to compel the removal of one already erected. The defendants, who own land abutting on the west, had notice from their deeds that the strip in question was a private alley, and it was open, when they took possession of their land in 1891, as a five-foot space between two-story brick buildings. In 1892 the strip was closed by the erection of a frame structure, the rent for which was collected and paid to the defendants, according to testimony for defendant, by a tenant and agent of an earlier owner of the land upon the east now owned by plaintiff. Immediately following 1892 the west part of the alley was assessed to the defendants; not all of it, however, until 1900, yet they have executed various deeds in which the strip in question is called a private alley. Before judgment herein they had begun the erection of a brick building covering a portion of the strip. *Held*, that the beginning of the possession was by permission of a former owner in plaintiff's chain of title and that such possession was not under any adverse claim of right. No possession can result in title by limitation unless the same is under a claim of right or color of title. The injunction is allowed and the removal of the structures is ordered.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

245 Mo.—27

AFFIRMED.

*Daniel Dillon* for appellant.

(1) Open, notorious, adverse and continuous possession of land for ten years confers title on the person holding such possession. This has been decided so often by this court, and has become so well recognized as a rule of law in this State, that a citation of cases is unnecessary. Fugate v. Pierce, 49 Mo. 441; Bradley v. West, 60 Mo. 40; Scannell v. Soda Fountain Co., 161 Mo. 618; Franklin v. Cunningham, 187 Mo. 195; Brewing Co. v. Payne, 197 Mo. 422; Adam v. Gossom, 228 Mo. 578; Long v. Coal & I. Co., 233 Mo. 740. On February 11, 1891, the Staeds, on the same day they received a deed for the eighty-four feet fronting on Chestnut street, received, also, from the same grantors, a quitclaim deed to the five-foot strip fronting on Chestnut street and extending south thirty-one feet. This gave them at least color of title to the five-foot strip for the length or depth of thirty-one feet extending southward from Chestnut street. Even without any color of title at all, open, notorious and adverse continuous possession for ten years gives title to the land actually occupied. Cottle v. Sydnor, 10 Mo. 770; St. Louis v. Gorman, 29 Mo. 593; De Graw v. Taylor, 37 Mo. 310; Mather v. Waltz, 107 Mo. 121; Wilkerson v. Eilers, 114 Mo. 253; Goldterman v. Schiermeyer, 111 Mo. 404; Quick v. Rufe, 164 Mo. 412. (2) The period fixed by the Statute of Limitations for the bringing of action for the recovery of real property applies to easements in land in like manner as to the land itself. Jones on Easements, Secs. 866 and 867; Wimer v. Simmons, 27 Ore. 3; Woodruff v. Paddock, 130 N. Y. 618; Galveston v. Williams, 69 Tex. 454; Boyce v. Railroad, 168 Mo. 591; Pittsman v. Boyce, 111 Mo. 392; Power v. Dean, 112 Mo. App. 297; House v. Montgomery, 19 Mo. App. 179; Auten-

rieth v. Railroad, 36 Mo. App. 254. (3) If some former owner of the land now owned by plaintiff was at one time entitled to an easement, entitling him to the use of the five feet in question as an alley, that easement was abandoned and extinguished long before plaintiff became the owner of the property. Scannell v. Soda Fountain Co., 161 Mo. 620. Twenty years was the period within which actions for the recovery of real property were required to be brought in those jurisdictions, where the court held that an adverse user for twenty years would extinguish an easement. In this State, as this court well knows, the period of limitation for bringing such actions is ten years.

*Richard A. Jones* for respondent.

(1) (a) The private alley so established, created an easement by express grant for such purposes. Church v. Kellar, 39 Mo. App. 441; Carlin v. Paul, 11 Mo. 32; Moses v. Dock Co., 84 Mo. 244; Parker v. Smith, 17 Mass. 411; Dill v. Board, 10 L. R. A. 276. (b) The creation of such alley gave to adjoining lots two distinct classes of rights; first, its use for purposes of ingress and egress, and, second, for light, air and ventilation. Dill v. Board, 10 L. R. A. 276; Gaus v. Railroad, 113 Mo. 308; Bloom v. Koch, 63 N. J. Eq. 10; Field v. Barling, 24 L. R. A. 406; Arnett v. Johnson, 15 N. J. Eq. 482; DeGeofroy v. Railroad, 179 Mo. 698; Barbour v. Liddy, 49 Fed. 896. (c) This easement by grant is a property right, as much as the ownership of the soil itself, and one of which the owner can only be deprived by like character of instrument or by such adverse possession for the statutory period, with all the accompanying elements necessary, not only to create title in the fee of the real estate itself, but also adverse as against the exercise of the various rights included in the easement. Nonuser for the statutory or any other length of time does not in

any manner affect such easement any more than would nonuser of any other character of real estate.    Dill v. Board, 10 L. R. A. 276; Structural Co. v. Distilling Co., 189 Mass. 145; Hofher v. Mede, 226 Ill. 320; Johnson v. Clark, 22 Ky. Law R. 418; Dwire v. Hawley, 79 Conn. 454.    (2)    (a) Lying at the foundation of the claim of title by limitation is the one all-controlling fact that the possession relied on must be adverse,—hostile, and continuously so, for ten years.  The possession from end to end, in warp and woof, must be hostile and continuously hostile.  And this is so because the law presumes every possession as consistent with the true title and ownership.  McCune v. Goodwillie, 204 Mo. 306; Heckescher v. Cooper, 203 Mo. 278; Dameron v. Jamison, 143 Mo. 483.  (c) Various deeds of conveyance were executed by defendant during the time it claims the alley was held by it by a possession adverse, which conclusively negative any such quality of possession.  One of these deeds was executed October 24, 1894, another April 8, 1901 and still another May 6, 1907, some three months  prior to the commencement of this proceeding.  Also deeds executed to defendant and by its predecessors in title of like character.  In all of these deeds, the property of defendant is described as extending on the east to this private alley and indeed in the three first mentioned, the very width of the alley is given.  The east bounds of the property, 125 feet east of the east line of Ninth street, the west boundary of the alley, also corresponds with the description of it contained in the deeds by which it was originally established. Mere oral testimony of statements made by a party in possession of real estate is competent to destroy the adverse character of the occupancy; much more is such evidence of value for such purposes when embodied in the solemn act of executing an instrument of conveyance of realty.  Indeed, in such case it is conclusive proof of acknowledgment that the holding is

not adverse, a disclaimer which may not be denied. Lajoye v. Primm, 3 Mo. 529; Whyte v. St. Louis, 153 Mo. 80; Anthony v. Building Co., 188 Mo. 704; Devoe v. Smeltzer, 86 Iowa, 391; Lamb v. Foss, 21 Me. 240; Heard v. Conner, 84 S. W. 605; Whitaker v. Thayer, 38 Tex. Civ. App. 537; Tomlinson v. Lynch, 32 Mo. 160; Milling Co. v. Riley, 133 Mo. 574; Hull v. Railroad, 21 Neb. 371; Baker v. Henderson, 156 Mo. 566. (3) (a) The frame structure over a portion of the alley was unlawfully erected and maintained and so *ipso facto* constituted a public nuisance. Railroad v. Kirkwood, 159 Mo. 239; Boom Co. v. Dickson, 77 Miss. 587. (b) Being such nuisance no matter how long continued, no prescriptive right could be acquired to maintain it. It was subject to abatement at any time. State ex rel. v. Vandalia, 119 Mo. App. 426; Kissel v. Lewis, 156 Ind. 233; Hynes v. Brewer, 194 Mass. 435; Isham v. Brodericks, 89 Minn. 397. (4) The quitclaim deed from Caroline Ryan, of date February 11, 1891, in which she quitclaimed her interest in "a parcel of land known as a private alley" does not contain anything inconsistent with the easement for alley purposes. This instrument would not constitute even such color of title as against such easement as would cause an occupancy of part to relate to the whole thirty-one feet, the purpose for which defendant claims it was offered in evidence. Crispen v. Hannaven, 50 Mo. 536; Hunter v. Wethington, 205 Mo. 293; Busch v. Houston, 75 Ill. 343.

ROY, C.—This is a proceeding in the circuit court of the city of St. Louis to enjoin the construction of a building on an alleged private alley, and to compel the removal of one already constructed.

Pending the suit and before the trial the building in contemplation by the defendant at the beginning of the suit was constructed.

There was a decree for plaintiff requiring the demolition of both structures, and restraining any future obstructions to the alley. Defendant has appealed.

The land in controversy is located in city block 190, bounded north by Chestnut street between Eighth and Ninth streets.

In 1854 the Lucas heirs were the owners of all the property abutting on the alleged alley. In that year they made partition by deeds to each one of them for separate parcels of the land. In all those deeds the land included in the alleged alley in controversy was described as "a space supposed to be five feet wide left by all concerned for an alley."

The plaintiff now owns forty feet fronting on Chestnut street and running south eighty feet six inches to a private alley ten feet wide which runs east to Eighth street. The defendant owns two tracts. One tract was acquired in 1891, and is eighty-four feet fronting on Chestnut street running south thirty-one feet; the east line of it being the west line of the alley. The other tract acquired by defendant in 1894 fronts twenty-six feet two inches on Ninth street and runs east one hundred and twenty-five feet to the alley, the east end of it being south of and adjacent to the other tract of defendant. The relative positions of those tracts with reference to the alley are shown on the following plat:

NINTH STREET

Curb Line

26′ 2″  26′ 2″  31′

McDONALD

41′

STAED REALTY CO

STAED REALTY CO.

125′

84′

McNARY

26′ 2″

26′ 2″

ONE STORY BRICK

80′ 6″

31′

5′

CHESTNUT STREET

Curb Line

C. B. 190

10″

DULCE REALTY CO.

40′

140′

ALLEY

100′

10′

80′ 6″

Curb Line

EIGHTH STREET

In that partition the land east of the alley was assigned to Henry S. Turner and wife, and the chain of title thereto down to the plaintiff is as follows: April 28, 1856, Turner and wife conveyed it without mentioning the alley to Henry L. Patterson, who, on May 1, 1856, conveyed to James H. Lucas, describing it as bounded "west by an alley five feet wide." On April 6, 1872, James H. Lucas conveyed it to Robert J. Lucas as trustee for Joseph D. Lucas, describing it as bounded "south by alley and west by Gardiner and others." On November 16, 1875, Robert J. Lucas, as trustee, conveyed it to Joseph D. Lucas by the same description as in the last deed. There is no explanation in the evidence as to why those two deeds described the land as bounded "west by Gardiner and others."

In 1903 Joseph D. Lucas died, devising all his property to his wife, who, on November 29, 1904, conveyed it to Wm. Bunning, and by a quitclaim deed of the same date she conveyed a strip five feet wide corresponding to the five-foot alley to said Bunning, describing it by metes and bounds, but not stating that it was an alley, and also a strip corresponding to the ten-foot alley, but not describing it as an alley.

On November 29, 1904, Bunning conveyed the property east of the alley to Hannah R. Daugherty, and also, by a quitclaim deed, conveyed the five-foot and ten-foot strips to Daugherty, not calling them alleys. On May 16, 1907, Daugherty conveyed the property east of the alley to the plaintiff, and also conveyed with it the two strips by quitclaim deed, as it was described in the deed to him. All the deeds in the plaintiff's chain of title to the land east of the alley conveyed the land with its appurtenances.

The chain of title from the Lucas heirs to the land west of the alley was not put in evidence.

On January 30, 1885, Robert S. McDonald conveyed the land fronting eighty-four feet on Chestnut

street immediately west of the alley, running south thirty-one feet, describing it as bounded east by a private alley, to Robert N. Noonan, trustee for Josephine Noonan. On January 3, 1889, the Noonans conveyed it to Alfred D. Ryan, trustee for his wife, describing it as bounded east by a private alley, and on February 11, 1891, the Ryans conveyed it by the same description to John Staed, Patrick M. Staed and Patrick J. Staed, and on the same day the Ryans conveyed to the Staeds by quitclaim deed for the expressed consideration of five dollars "a parcel of land in block 190 of said city of St. Louis, being known as a private alley, and fronting on the south line of Chestnut street about five feet more or less, by a depth southwardly of about thirty-one feet, the west line thereof being one hundred and twenty-five feet east of the east line of Ninth street, and bounded on the north by Chestnut street, west by property conveyed to Staed et al., by deed dated February 11, 1891, and east by Lucas."

At the time of the conveyance to the Staeds there were two-story brick buildings fronting on Chestnut street on both sides of the alley, the walls being five feet, three and one-fourth inches apart. The west building extended south thirty-one feet, and the wall next to the alley was without openings except a window near the south end in the second story. The wall on the east side of the alley was without openings and extended further south than that on the west side. On both sides of the alley fences ran south from the corners of those buildings to the ten-foot alley. Those fences remained there until shortly before this suit began. The alley was open in 1891 from Chestnut street to the ten-foot alley. There was no opening or gate in the fence on the east side of the alley.

In 1892 the north end of the alley for a distance of about twenty-one feet was enclosed by wooden framework and doors on the north and south and with

a roof and floor, and the room thus formed herein-after called the "cigar store" was occupied most of the time by cigar men, and a part of the time by a bootblack and by a brick man. It rented at ten dollars a month up to the time of the trial.

On April 18, 1894, the Staeds conveyed to the Staed Realty Company land described as follows: "A lot of ground in city block 190 of said city of St. Louis, beginning at a point in the south line of Chestnut street forty-one feet east of Ninth street; thence east along south line of Chestnut street eighty-four feet to west line of private alley; thence south along west line of private alley parallel to Ninth street thirty-one feet to the northeast corner of property now or formerly of Wolff et al.; thence west parallel to Chestnut street eighty-four feet to the southeast corner of property of Robert S. McDonald; thence north parallel to Ninth street thirty-one feet to the point of beginning."

No deed to the defendant was in evidence for the twenty-six feet, two inches fronting on Ninth street; but on October 24, 1894, the defendant executed a deed of trust describing it as follows: "A lot of ground in said city block 190 containing a front of twenty-six feet four inches, more or less, on the east line of Ninth street, by a depth eastwardly of one hundred and twenty-five feet, more or less, to a private alley five feet wide. Bounded on the west by Ninth street, east by a private alley, south by a lot now or formerly of S. J. Fisher et al., and north by a line thirty-one feet south of the south line of Chestnut street."

On April 8, 1901, the defendant executed a deed of trust on property described as follows: "A lot of ground in block 190 of said city of St. Louis, fronting twenty-six feet and two inches on the east line of Ninth street, by a depth eastwardly of one hundred and twenty-five feet, more or less, to the west line of a private alley five feet wide, and bounded on the north in part by property also conveyed in said deed, and

in part by property formerly of R. S. McDonald, and
on the east by a private alley, and on the south by
property formerly of Minnie L. Siegrist, and on the
west by Ninth street; and also a lot of ground in said
block having a front of eighty-four feet on the south
line of Chestnut street, by a depth southwardly of
thirty-one feet, more or less, to the northern line of
property first described in said deed. Bounded on the
north by Chestnut street, on the east by said private
alley five feet wide, on the south by the property first
described in said deed, and on the west by a line forty-
one feet, more or less, east of the east line of Ninth
street.''

On May 6, 1907, the defendant executed a deed of
trust on property described thus: ''Parcel 1. That
part of city block numbered 190, beginning in the
south line of Chestnut street at a point forty-one feet,
more or less, east of the southeast corner of Ninth
and Chestnut; thence east on the south line of Chest-
nut eighty-four feet, more or less, to a private alley
five feet wide; thence south with the west line of said
private alley thirty-one feet, more or less, to the north-
east corner of property formerly owned by M. A.
Wolff, and now owned by Staed Realty Co.; thence
west and parallel with Chestnut street eighty-four feet,
more or less, to the southeast corner of premises now
or formerly owned by R. S. McDonald; thence with
the east line of said last mentioned premises thirty-
one feet to the place of beginning. Parcel 2. That
part of said city block 190 beginning on the east line
of said Ninth street at a point thirty-one feet, more
or less, south of the southeast corner of said Ninth
and Chestnut streets, running thence eastwardly one
hundred and twenty-five feet, more or less, to the west
line of a private alley five feet wide, at a point there-
on which is the southeast corner of parcel 1, above
described; thence southwardly with the west line of
said private alley twenty-six feet, four inches, more

or less, to the property now or formerly of Minnie L. Siegrist; thence westwardly with the north line of said property of Siegrist one hundred and twenty-five feet to the east line of Ninth street; thence northwardly with the east line of Ninth street twenty-six feet, four inches to the place of beginning.''

Mr. John Staed testified for defendant as follows: ''Mr. Farley, the real estate agent, occupied this property east of this five feet, and was a tenant of Mr. Lucas; that is the property now owned by the Dulce people and occupied by Waide & Willis. For a great many years Thomas Farley, real estate agent, occupied that as his office.

''Q. During all that time did that property belong to Joseph Lucas? A. I suppose so; I do not know who it belonged to, but I think it was Lucas's agent.''

### CROSS-EXAMINATION.

''Q. This construction that covered that five feet on the front there on Chestnut street, is that brick or stone, or what? A. You can look at it there and see. I think it is wood myself. I never examined it very sharp. My brother got it built, I didn't build it.

''Q. Isn't it a fact that Farley built it there? A. Not that I know. I am sure he never did build it. I would know something about it if he did.

''Q. Who was in charge of the Staed Realty Company's affairs fifteen years ago? A. Well, my brother was the leading man, and I was secretary and treasurer then. I paid all the bills.

''Q. The Staed Realty Company didn't own this property originally, this eighty-four feet,—it was owned by you and your brother and a number of others? A. It was the same stockholders as we have now.

"Q. It was owned by you severally? A. Yes, sir.

"Q. Who was managing that property then—handling it? A. I got the money out of the rents and paid the bills. I have been always getting the rents and tending to that property. We had Mr. Mc-Menamy collect some rents and Mr. Brennan collect some, and Mr. Farley. Mr. Farley just collected for that cigar place; that was all he collected. He collected ten dollars a month and gave it to me. He gave me ten dollars a month during a period of twelve or thirteen years, I suppose. He charged a commission of three per cent.

"Q. Why did he collect for that and the others collect for the balance of your property? A. Well, Brennan had been collecting for the other officers there, and my opinion is that Mr. Farley asked me to give him some of our collections, and we commenced with that, I think.

"Q. He collected that because he had built that shack, had he not? A. No; he did not build the shack. I don't think so. My brother told me he got the shack built. That is all I know about it.

"Q. You say your brother told you he built the shack there? A. Yes, sir; I paid for it. I was treasurer and paid all the bills at that time.

"Q. Who did you pay for it? A. My opinion is, I gave him the money to pay the men who built the shack there. I don't remember who built it. It is such a long time ago I have not any account of it now. My brother attended to that part of the business which I have to attend to now, since he died. He attended to the building associations and several things of that kind, we managed it between us. We didn't have any fixed thing about it. We were all one, you might say.

"Q. I will ask you this question. I will ask you whether or not it was your intention when you took possession of that property and all the time you have

occupied it, to claim it as owner, or whether you did claim it as owner? (Objected to by plaintiff.) A. My intention was, of course, that it was our property. They had neither a door or window or anything else to show they had any claim to it; they had an alley to the rear of their own lot.''

Mr. Levy, a tenant of the defendant and a real estate man, testified that the side walls of the cigar store were the brick walls of the adjoining buildings; and that there was a fence ten feet high across the alley thirty-one feet south of Chestnut street which has been there for sixteen years. He also testified there was a fence on the west side of the alley and a fence from the brick building on the east side of the private alley that ran out into the ten-foot private alley.

It was the custom of the revenue department of the city to assess private alleys to the adjoining owners. Up to 1900, defendant paid taxes on eighty-seven feet, nine inches on Chestnut street front and one hundred and twenty-five feet deep fronting on Ninth street. After that it paid on eighty-nine feet fronting on Chestnut street. At the time the cigar store was built there was an ordinance requiring a building permit from the building commissioner before any building could lawfully be erected, and further providing that no permit should issue for a frame or wooden building in that district, and making it a misdemeanor to violate that ordinance. No such permit was issued for the construction of the cigar store.

Just prior to, and at the time of, the bringing of this suit, the defendant was excavating for the purpose of constructing a building on the east end of its tract which fronts on Ninth street, with the intention on the part of defendant of constructing that building on the alley with its east wall flush with the east line of that alley. Pending the suit and before the trial such building was constructed one story high.

I. It may help us to understand the questions involved if we first determine what the rights of the owners of the property abutting on the alley were prior to the beginning of the controversy. The Lucas partition deeds created an easement in the alley in favor of those parties, and such easement was appurtenant to the several tracts of land and passed to the grantees through the mesne conveyances down to the parties to this controversy, unless it has been abandoned or extinguished in some way.

Washburn on Easements, Ch. 1, Sec. 1, Par. 13, says: "The owner of an easement in another's land has neither the general property in nor seisin of the servient estate, though he may, by holding a fee in the estate to which such easement is appurtenant, have an estate of inheritance in the easement. And from being something impalpable, of which a seisin cannot be predicated, easements are classed with incorporeal hereditaments, and are so designated in the definitions thereof."

Where, therefore, one grants or reserves a right of easement over one parcel of land in favor of another, such easement, by such act of creation or annexation, would become incident and appurtenant to such estate respectively, and pass as appurtenant in after conveyances, by, or even without, the word appurtenances, so long as such estates should subsist as distinct estates in different proprietors.

II. At the time of that partition the Lucas heirs owned all the land including that in the alley. The deeds did not expressly convey the fee in the alley to any one.

It is a well known rule that, in the absence of evidence to the contrary, it will be presumed that the owners of property abutting on a public way hold the

fee to the center of the way. In Holmes v. Belling-
ham, 7 C. B. N. S. 329, decided by the English Court
of Common Pleas in 1859, Chief Justice Cockburn
said: "The same principle which applies in the case
of a public road, and which is the foundation of the
doctrine, seems to me to apply with equal force to the
case of a private road. That presumption is allowed
to prevail upon grounds of public convenience, and to
prevent disputes as to the precise boundaries of prop-
erty; and it is based upon this supposition—which may
be more or less founded in fact, but which at all events
has been adopted—that, when the road was originally
formed, the proprietors on either side each contribu-
ted a portion of his land for the purpose. I think
that is an equally convenient and reasonable principle
whether applied to a public or to a private road; but,
in the latter case, it must of course be taken with this
qualification, that the user of it has been *qua* road and
not in the exercise of a claim of ownership."

That case was cited with approval in Dill v. Board
of Education, 47 N. J. Eq. 421.

It is thus seen that the defendant has no title in
any event to the east half of the alley unless it has
established title by the Statute of Limitations. The
mere destruction or abandonment of the easement
would not give defendant title to the east half of the
alley.

The easement was acquired by deed and the cases
are practically unanimous to the effect that an ease-
ment so acquired cannot be lost by mere nonuser.
[Dill v. Board of Education, supra; Structural Co. v.
Distilling Co., 189 Mass. 1. c. 153; Wiggins v. Mc-
Cleary, 49 N. Y. 346.]

The deed made in trust for Joseph D. Lucas by
James H. Lucas in 1872 and the trustee's deed to Jo-
seph D. Lucas made in 1875 do not mention the alley,
and state that the land therein conveyed was bounded
on the west by the land of Gardiner et al. There is

no other evidence of any kind in the case that Gardiner owned the land west of the alley or claimed the alley. On the other hand, all the evidence in the case shows that the alley was there and undisputed by anybody at the time those deeds were made. We are justified in regarding those recitals as to Gardiner et al. as being made by some inadvertence.

III.   In 1891, when the Staeds became the owners of the land on the west side, Joseph D. Lucas owned on the east side of the alley. Lucas, as his name indicates, is supposed to have been one of the family who created the alley; and he had owned his land for nineteen years. The Staeds were notified by their deeds that the alley was there. It was open from Chestnut street to the ten-foot alley on the south. All concerned knew of it, and no one was hostile to it.

It is claimed *now* that the quitclaim deed from the Ryans for the five foot strip gave the Staeds "color of title." If so, it was decidedly "off color," for it stated that the strip was "known as a private alley." We construe that deed not as an impeachment of the alley, but as a confirmation of it, and we think it was so considered at the time it was made, by the parties thereto.

Such being the condition of the alley and the attitude of the parties towards it in 1891, we are interested in discovering how the cigar store got in there in 1892. Did the Staeds put it there with the intention to permanently hold the strip as their own? We are justified in drawing the inference that they were experienced in real estate matters. They knew the requirements as to building permits and as to the illegality of wooden structures in that district. They do not seem to have regarded that structure as of sufficient importance to require a conformity with the law as to it. It must have cost very little to construct it,

245 Mo.—28

and it rented for ten dollars a month. Lucas is dead. Patrick M. Staed, a former sheriff of St. Louis, who attended to the building of it on the part of the Staeds, is dead. Mr. John Staed, who testified for the defendant, did not even know who built it. He said, "My brother told me he got the shack built. That is all I know about it. I was treasurer and paid all the bills at that time. My opinion is, I gave him the money to pay the men who built the shack there." On the other hand, Mr. Farley was a real estate man, had an office in the Lucas property and was Lucas's agent. The Staeds had a real estate man, who, as their agent, collected all their rents except for this cigar store. The rent on that, for about twelve years, was collected by Farley, Lucas's tenant and agent. On that question Mr. John Staed testified:

"Q. Who was managing that property then—handling it? A. I got the money out of the rents and paid the bills. I have been always getting the rents and tending to that property. We had Mr. McMenamy collect some rents and Mr. Brennan collect some, and Mr. Farley. Mr. Farley just collected for that cigar place; that was all he collected. He collected ten dollars a month and gave it to me. He gave me ten dollars a month during a period of twelve or thirteen years, I suppose. He charged a commission of three per cent.

"Q. Why did he collect for that and the others collect for the balance of your property? A. Well, Brennan had been collecting for the other offices there, and my opinion is that Mr. Farley asked me to give him some of our collections, and we commenced with that, I think."

The fact that Farley was Lucas's tenant and agent and collected the rent on the cigar store while the rents of the Staed property were collected by another agent is a strong circumstance in favor of the inference that the cigar store was not built in opposition

to Lucas, but with his consent and permission, at least. On the other hand, Mr. Staed stated only his ''opinion'' and what he ''thought'' as to what the facts were.

Immediately following 1892 the west part of the alley was assessed to the Staeds, but not all of it until 1900. In 1894 the deed was made to the Staed Realty Company. It has been suggested that the reason the alley was mentioned in that deed was because the conveyancer followed former deeds by copying. In the statement of facts the descriptions in the various deeds of trust thereafter executed by the defendant are given. A comparison of those descriptions will show that the conveyancer did not always follow copy, but did always clearly call for the alley. In addition to those facts, the defendant acquired the south tract fronting twenty-six feet, two inches on Ninth street in 1894. Its deed was not put in evidence, but about the same time it executed a deed of trust on its new purchase which called for the alley. If that alley got into that deed of trust purely as the result of copying, those experienced real estate men interested in the defendant company were surely the victims of their conveyancers.

The claim is made by the appellant that the evidence shows that the part of the alley covered by the new building was, prior to the construction of that building, included in the defendant's yard. The evidence does not support such contention. Some parts of it are capable of that construction, but the whole of it taken together, including that of defendant's witnesses, shows that there was a fence between that part of the alley and defendant's yard. Up to the time when defendant prepared to build that new building just before this suit was begun, it had never pretended to claim that part of the alley.

We are driven to the conclusion from the facts that the beginning of the possession of the cigar store

by the Staeds was originally with the permission of Lucas and that such possession was not under any adverse claim of right until very shortly before this suit was brought. No possession can result in title by limitations unless the same is under a claim of right or color of title. [Bowman v. Lee, 48 Mo. 335; Fugate v. Pierce, 49 Mo. 441; Dalby v. Snuffer, 57 Mo. 294; Bradley v. West, 60 Mo. 33; Baber v. Henderson, 156 Mo. 566; Heckescher v. Cooper, 203 Mo. 278.]

The judgment is affirmed. *Blair, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.