**M. H. SIEGFRIED REAL ESTATE, INC., et al., Plaintiffs-Appellants,**

v.

**James P. RENFROW et al., Defendants-Respondents.**

**Nos. KCD 30355, KCD 30403.**

Missouri Court of Appeals, Western District.

Dec. 3, 1979.

Motion for Rehearing and/or Transfer Denied Dec. 31, 1979.

Cedric Siegfried, Robert J. Wise, J. Russell Ford, Independence, for plaintiffs-appellants.

C. John Forge, Jr., Independence, for defendants-respondents.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

The present case grows out of a dispute between the plaintiffs, M. H. Siegfried Real Estate, Inc., and its grantees, Billy J. Holt and Donna Marie Holt, to whom the disputed property was conveyed during the pendency of the action; and the defendants, James P. Renfrow and Alice Renfrow, over the status of a 25-foot strip of land lying between their properties on Truman Road in Independence, Jackson County, Missouri.

Plaintiffs claimed to have an easement over such strip for ingress to and egress from its property, which had been obstructed by defendants Renfrow. Defendants denied that plaintiffs had an easement, and also contended that their claim was barred by the 10-year statute of limitations.

Plaintiffs' requested relief of injunction and damages was denied by the trial court and plaintiffs have appealed. We reverse and remand with directions.

The disputed strip is shown on the plat of the Locust Lawn subdivision as extending from Truman (formerly Van Horn) Road on the north to Lexington Avenue on the south, a distance of 647.05 feet. It lies

along the easternmost side of the platted subdivision. Plaintiffs' real estate is Lots 15 and 16 of Locust Lawn, fronting 100 feet along Truman Road on the north, and bordered on the east, 200 feet in depth, by the disputed strip. Actually Lot 16, the east lot, joins the strip. Lot 16 is unimproved, while Lot 15, lying immediately to the west of Lot 16, has a 50-foot by 50-foot commercial building on its north (Truman Road) end.

We are here concerned only with that segment of the contested tract which extends south from Truman Road a distance of about 130 feet to a creek or gully which crosses the strip.

The property of the defendants Renfrow fronts on Truman Road and lies to the east of, and adjoins, the disputed strip. The Renfrow property is entirely outside the Locust Lawn subdivision.

Plaintiffs' suit sought to enjoin the defendants Renfrow from maintaining across the north end of the 25-foot strip a cable suspended from steel posts, which prevented entry to the strip from Truman Road on the north. This cable was erected by defendants on about April 1, 1975. In May, 1976, a year after this suit was commenced, the defendants erected along the west side of the strip, along the boundary between the strip and plaintiffs' Lot 16, a steel mesh fence which ran from the south end of a fence, which had earlier been erected by plaintiff Siegfried, southward to the ditch or creek a distance of 50 or 60 feet. These two obstructions, along with plaintiffs' fence, which extended south from Truman Road 50 or 60 feet, and the creek, effectively bar plaintiffs from any access between their property and the 25-foot strip, and enclose the strip with defendants' property lying to the east thereof. Access can be had only from defendants' property.

The plat of "Locust Lawn" was executed and filed for record September 25, 1947, by Leroy Pete Langley and Leona Langley. The 25-foot strip from Van Horn Road south to Lexington Avenue is designated on the plat "private road". The plat, however, contains the following language: "All thoroughfares shown on this plat and not heretofore dedicated to public use are hereby so dedicated".

Until 1974 or early 1975, there was nothing to mark the boundaries of the 25-foot strip. It was simply vacant space between the properties of the plaintiffs and the defendants. It had never been improved, graded or prepared for use as a road. In late 1974 or early 1975 Siegfried built the above-mentioned fence from Truman Road south along the east line of plaintiffs' property on the west boundary of the 25-foot strip, a distance of 50 or 60 feet.

Defendants Renfrow had occupied their property since 1958, where they operated a machinery and spare parts business. For the first 15 years they had occupied it as tenants under a lease, but they acquired title to the property by purchase on September 6, 1973. Both the Renfrows and tenants of the Siegfried property had utilized the southern portion of the 25-foot strip, extending up to 50 feet north of the creek, for storage of materials, but the north portion of the road had not been used before 1974 as a repository for materials by occupants of either property. According to the plaintiffs' testimony, and it was so found by the court, the northern portion of the property was used for ingress and egress between Truman Road and plaintiffs' property. Even after the erection by plaintiff Siegfried of the fence on the boundary between its property and the 25-foot strip, a distance of 50 or 60 feet southward, one could still drive down the 25-foot strip from Truman Road around the south end of the fence and thus gain access to plaintiffs' property.

Appellant Siegfried held title under a deed which describes the property as "all of Lots 15 and 16 in Locust Lawn, a subdivision in Jackson County, now City of Independence, Missouri, as per the recorded plat thereof". The printed portion of the deed, which follows the typed description, contains the following language: "With all and singular the rights, privileges, appurtenances and immunities thereto belonging . . ." Exactly the same language is used to de-

scribe the property in deeds to its predecessors in title going back to October 27, 1952. The October 27, 1952, deed is from John A. Dowker and Bonnie M. Dowker, his wife, to Cedric Siegfried. We do not have in evidence any deed from the Langleys, who were the platters of this subdivision in 1947. We do not have the deed from Siegfried to the Holts, but no argument is made that they did not succeed to all of Siegfried's rights in the easement, and we so assume.

The Renfrow property, on the other hand, is described by metes and bounds, a tract 200 feet north and south by 47.5 feet east and west. As earlier noted, it lies on the east side of the disputed 25-foot strip, and fronts on Truman Road. The parties have stipulated that it lies wholly outside the Locust Lawn platted subdivision.

*Easement as an appurtenance to Lot 16.*

A resolution of the dispute requires the determination of plaintiffs' rights, if any, in the 25-foot strip.

It is quite plain that the deed from the Dowkers and successive deeds which by mesne conveyances vested title in the present plaintiffs, gave to the plaintiffs a right to use the 25-foot "private road" for ingress and egress to their property. A conveyance which conveys property by reference to a map or plat, which map or plat shows the property so conveyed is bounded by a road or way, the right-of-way thereover passes by the conveyance as an easement appurtenant thereto. *Goad v. Bennett,* 480 S.W.2d 77, 80 (Mo.App.1972); *Winslow v. Sauerwein,* 285 S.W.2d 21 (Mo. App.1955).

It is not necessary for us to resolve the ambiguity in the plat which designates this strip as a "private road", and yet which purports to dedicate to public use "all thoroughfares shown on this plat and not heretofore dedicated to public use". Whether this particular roadway is dedicated to the public use or not, the plaintiffs as owners of Lot 16 of "Locust Lawn", had the right to use it as a right-of-way in connection with that lot. *Goad v. Bennett, supra,* at 80; 28 C.J.S. *Easements* § 39, p. 701 (1941).

*Ten-year statute of limitations: § 516.-010, RSMo 1978.*

This would be the end of the case except for the contention of defendants Renfrow that plaintiffs' claim is barred by § 516.010, RSMo 1978, the ten-year statute of limitations. To determine if the statute of limitations has run, or commenced to run against plaintiffs' claim of easement, and if so when, we must examine the character of the use which the defendants Renfrow made of the land.

Defendants' limitations defense is here presented in an unusual posture, for they expressly disclaim any claim of their own upon the land based upon adverse possession; they raise the defense solely as a defense against plaintiffs' claims, to deny plaintiffs the relief they have requested. In the more familiar case, a party in possession is seeking to establish his own title as against a challenger upon the basis of adverse possession for the statutory limitations period. The two uses of limitations, i. e., as an offensive and as a defensive weapon, however, are correlative and the same legal principles apply. In either case, the party asserting the statute of limitations must show adverse possession for the statutory period. *Loumar Development Co. v. Redel,* 369 S.W.2d 252, 258 (Mo.1963); *Dulce Realty Co. v. Staed Realty Co.,* 245 Mo. 417, 151 S.W. 415 (1912).

To begin the running of the limitations period, defendants must have asserted an unequivocal dominion over the property in such a way as to give notice to plaintiffs of the adversity of their possession. *Franck Bros., Inc., v. Rose,* 301 S.W.2d 806, 811–812 (Mo.1957). We will search the evidence for such an event.

Defendants Renfrows' tenancy of the land now owned by them commenced in 1958. They occupied the land as tenants under lease until 1973 when they purchased it. Since that time they have owned and occupied the property.

During all that period of time the defendants Renfrow have operated a spare machinery parts business. During all that

time they apparently freely deposited various machinery and machine parts on the south portion of the disputed tract. The segment of the road upon which the machinery and spare parts were placed extended from the creek north for a distance estimated at 50 feet. This use of the property by the defendants was not objected to by anyone. During all that time the north segment of the road, estimated to extend south from Truman Road approximately 80 feet, was unobstructed by any of the machinery or spare parts. There was testimony that the disputed strip during those years was used for ingress and egress from Truman Road to the Siegfried property. The court found on this point that "plaintiff . . . during the time that it owned Lots 15 and 16 in Locust Lawn, and its tenants, made limited use of the northerly part of the 25-foot strip for ingress and egress to Lot 16 . . ." There is in the record substantial evidence to support this fact finding by the trial court.

The defendants Renfrow were not the only ones using the southern portion of the 25-foot strip for storage. The court found, and there was evidence to support this finding, that John E. Phillips, a tenant of Siegfried, stored scrap metal material on the strip between 1964 and 1973.

Before 1974, the use which the defendants Renfrow made of the 25-foot strip did not obstruct plaintiffs' use of it for ingress and egress, for only the north portion of the strip was needed for that purpose.

In October of 1974 Siegfried was preparing to renovate its property. It had arranged for a survey of the property to locate the boundaries thereof, and also to locate the boundaries of the 25-foot strip. At that time Siegfried, acting through its agent, John Decker, asked the Renfrows to remove from plaintiffs' Lot 16, which lay east of the 25-foot strip, the material which belonged to them. We take it that the plaintiffs' property had been vacant for some months, perhaps since the termination of the tenancy of John E. Phillips sometime in 1973. During this period the defendants' materials had overflowed on to Lot 16, the easternmost lot of plaintiffs' property.

Shortly after that time Mr. Renfrow called Decker and asked if Siegfried would sell him about 30 feet of its property. Siegfried would not do so. Renfrow then asked the price for the entire property, and was told it was $60,000. After inspecting the property, Renfrow offered $30,000. His offer was rejected. The Renfrows did remove their property off Lot 16. Some of it was moved onto their property, behind their building, but part of it was moved onto the 25-foot strip. Decker asked Renfrow not to block the private drive as they would be using it to get into and out of the property. According to a memo contemporaneously made by Decker: "He got very mad at me and said that that property belonged to the city and we couldn't tell him what to do or not to do with it. I tried to explain to him that the property didn't belong to the city but he wouldn't listen. He said, 'I guess I'll have to get a lawyer to look into this matter' . . . I was just trying to tell him that we're planning on using the drive and we didn't want him to move all his stuff on it and then have to move it again."

The defendants Renfrow repeatedly stated in their testimony, and have stated in their brief in this court, that they at all times knew that the 25-foot strip was not their own; they believed that it belonged to the city; they knew it was not theirs, and they knew that their landlord, before their purchase of the adjoining property, did not claim the 25-foot strip. They did not intend to keep everybody else off the property; no one ever asked to use it. The trial court found, and there is an abundance of evidence to support the finding: "The defendants Renfrow did during the time they were tenants, until they purchased the property in 1973, use parts of the 25 foot strip for the storage of materials utilized in their business but did so with the knowledge that they made no claim of ownership to the strip, nor had their landlord and predecessor in title, asserted any claim of ownership. Although prior to 1975 the defendants Renfrow stored scrap material on the south portion of their own property and on the

southerly portions of the 25 foot strip lying near the creek, or immediately north of the creek, these materials did not block or obstruct access to the entire 25 foot strip, nor extend farther north than the rear of the defendants' building".[1] We do not find in the record the north-south length of defendants' building, but it appears from the photographs to extend southward from Truman Road a distance of 75 to 100 feet.

The court further found as facts:

"The defendants Renfrow have at no time paid any real property taxes on any part of the private road nor, prior to 1975, have they fenced any part of the 25 foot strip, nor have they ever erected any signs upon it against trespass by others, nor signs naming or referring to themselves as owners or proprietors, nor have they ever claimed to own any part of the 25 foot strip themselves, but have always regarded it as city property, have never prevented nor attempted to prevent any other persons from access to the 25 foot strip until the cable and fence were erected in 1975.

"Until the steel cable and the wire mesh fence were erected by the Renfrows in 1975, the plaintiffs and their predecessors had not been barred from access to or use of the 25 foot strip."

The Renfrows stated in testimony that their purpose in placing the obstruction across the 25-foot strip was to prevent thieves coming in to steal their property. It was not their purpose, Mrs. Renfrow said, to keep out anybody except thieves. Mr. Renfrow said that he believed he could use the strip of land "just because it was there and it wasn't in use, that's why". He knew he didn't own it, he knew his landlord didn't own it, but nobody had been using it and it was available. He felt the city owned it, and stated that if the city wanted to take possession of it and use it "I'd have to give it to them".

By their own testimony defendants never occupied the property adversely, nor used it adversely, before October, 1974, when defendants refused to remove their property upon plaintiff Siegfried's request, or when the cable was placed across the north end of the strip on or about April 1, 1975. We are not called upon to decide upon which of those dates, if either, the statute of limitations commenced to run, since it is plain that it did not start any earlier than October, 1974, and had not barred plaintiffs' claim.[2]

In the case of *Kansas City Milling Company v. Riley, et ux.*, 133 Mo. 574, 34 S.W. 835 (1896), the defendants had erected a house on a strip of ground designated upon a subdivision plat as Lulu Street. They put the house in the street, according to the court's opinion, "intending to stay there as long as they could, and for the purpose of saving rent, and to avoid the payment of taxes". Defendant had no deed or other written claim to the ground on which their house stood when they first went on the property, nor at any time afterwards. They always claimed the place as home from March, 1879, until July, 1891, when the judgment was rendered upon the trial of the case. In granting an injunction against the maintenance of defendants' house in the street, the court said: "The evidence does not sustain the theory of 10 years' adverse possession by defendants. It plainly appears from defendants' own evidence that they did not build their house in the street with the intention of holding the ground occupied by them adversely as against the owner, and that they did not determine to do so until about twelve months before the beginning of this suit. The evidence is quite conclusive that their purpose in building in the street was to

---

1. "Where the claimant occupies land without color of title, in order to prevail, he must show physical possession of the entire area claimed . . . ." *Teson v. Vasquez*, 561 S.W.2d 119, 126 (Mo.App.1977). This case contains a rather thorough discussion of the doctrine of adverse possession.

2. " '[W]ith respect to proceedings for a declaratory judgment * * * the statute of limitations does not begin to run until an actual controversy has occurred.' " *Kleinheider v. Phillips Pipe Line Co.*, 528 F.2d 837, 844 (8th Cir., 1975). *See also Keiser v. Wiedmer*, 283 S.W.2d 914, 918 (Mo.App.1955), and *Swon v. Huddleston*, 282 S.W.2d 18, 28, 29 (Mo.1955).

**494**

avoid the payment of rent and taxes, and that the idea of claiming the ground as their own was an afterthought. The statute of limitations did not begin to run in favor of defendants until they determined to hold the ground occupied by them adversely." 34 S.W. at 838.

See also *Rosemann v. Adams*, 398 S.W.2d 855 (Mo.1966), where defendant Adams had claimed an easement by adverse user over a portion of plaintiff's lot for the statutory limitations period. The court said: "Mr. Adams testified that he 'figured' that the area in question 'was a street belonging to the Village'. His use of the area under such an assumption was, therefore, neither exclusive nor under individual claim of right. No claim of individual right of easement by prescription may arise by virtue of such use by the defendants. 17A Am.Jur., Easements, § 82, p. 698." 398 S.W.2d at 858.

■ We conclude, therefore, that the use by defendants Renfrow of the embattled road from 1958 down to the time of trial gave them no claim upon said property which they would not have had absent such use, nor did the statute of limitations run against the claims of the plaintiffs. The obstruction of the private road by the posts and cable strung across the north end thereof, the fence built by defendants on the east side thereof, and the maintenance of the storage materials after plaintiffs' request that they be removed, were wrongful acts on the part of the defendants which ought to be enjoined.

■ Defendants' acts having been found to be wrongful, the plaintiff was entitled to any damages proximately caused thereby. *Judge v. Durham*, 281 S.W.2d 16 (Mo.App. 1955). Plaintiff offered testimony of the reasonable market value of their property with the 25-foot strip open and available for ingress and egress to the property, and its reduced value with the private road obstructed and not open for use. Witness Siegfried, president of the plaintiff corporation, testified that the value of the property with the unobstructed easement would be $65,000, but with the obstructed easement, the value would be $53,000.

The correct measure of damages, however, is not the reduction in market value, but is the reduction, if any, of the rental value of the property during the maintenance of the obstruction. *DeSalme v. Union Electric Light & Power Co.*, 232 Mo. App. 245, 102 S.W.2d 779, 782 (1937). Upon remand, the trial court will hear evidence to determine such damages and will award plaintiff Siegfried any such damages so found, plus any punitive damages found to be owing. *Bellerive Country Club v. McVey*, 284 S.W.2d 492, 503 (Mo. banc 1955); *Riddle v. Dean Machinery Co.*, 564 S.W.2d 238, 259 (Mo.App.1978); *Gould v. Starr*, 558 S.W.2d 755, 771 (Mo.App.1977); *Youngs Drug Products Corp. v. Dean Rubber Mfg. Co.*, 362 F.2d 129, 134-5 (7th Cir. 1966). The plaintiffs Holt have not joined in the prayer for damages, but have joined only in the prayer for the injunctive relief. Plaintiff Siegfried's entitlement to damages will end with its transfer of the property to the Holts. *See Thompson v. Hodge*, 348 S.W.2d 11, 15 (Mo.App.1961).

The judgment of the trial court is reversed, and the cause is remanded for the entry of a new judgment by which the defendants will be enjoined forthwith to remove the obstructions described in evidence and enjoined from further obstruction of the 25-foot strip. After hearing evidence of the amount of damages, the court should award to the plaintiff Siegfried any damages found to be owing to it as a result of the unlawful obstruction of the easement by the defendants up to the time of transfer to the Holts.

■ The Langleys, original platters of "Locust Lawn", sought after the court's judgment to intervene in the case, and were denied leave to do so. They filed a notice of appeal, but have not filed a brief in this court. Their appeal is therefore abandoned, and the same is dismissed by this court. *City of Kirkwood v. Missouri State Bd. of Mediation*, 478 S.W.2d 690, 699 (Mo.App. 1972); Supreme Court Rules 84.08, 84.27.

All concur.