[No. 1941]

# M. J. HOWARD and JOHN PICETTI, Appellants, v. JOHN WRIGHT and JOHN WRIGHT, Jr., Respondents.

[143 Pac. 1184]

1. Adverse Possession—Acquisition of Easement by Prescription —Permissive Use.

The permissive use of one's premises, however long continued and whether the permission be express or implied, confers no rights of continued enjoyment.

2. Adverse Possession—Estate by Prescription—Essential Elements—"Adverse User."

To constitute the "adverse user" which is essential to the acquisition of an estate by prescription, it is essential that the possession be by actual, open, and notorious occupation, hostile to the title of the owner of the servient estate, and that it be under an exclusive claim of right, and be continuous and uninterrupted for five years prior to the commencement of the action.

3. Easements—Acquisition by Prescription—Sufficiency of Evidence—Right of Way.

Evidence in an action to enjoin defendants from trespassing on plaintiffs' land *held* to show that defendants' use of the right of way claimed over such land was permissive, and hence could not ripen into an easement by prescription.

4. Easements—Right of Way—Acquisition by Prescription— Presumption.

Where a landowner opens and keeps open a road across his land for his own use, the fact that an adjoining owner makes use of the road under circumstances not interfering with the former's use creates no presumption that the latter's use of the road is adverse so that it can ripen into an easement by prescription.

5. Easements—Existence of Adverse Right—Use of Way by Owner.

No adverse right can exist in a way used by the owner of the land over which it passes.

6. Easements—Right of Way—Leaving of Gate—Effect as Evidence.

The act of the owners of land in leaving a gate across a way of which they themselves made use tended to rebut the presumption that the use of the way by an adjoining owner was adverse.

7. Easements—Prescription—Adverse User of Right of Way— Repairs.

Where not only the adjoining owner, but the owner of the land over which a way was established, used the way, the act of the adjoining owner in constructing and maintaining bridges and in doing grading did not make his use adverse, so that it could ripen into an easement by prescription.

8. EASEMENTS—RIGHT OF WAY—PRESUMPTION FROM USE.
   The presumption of a right arising from the unexplained use of a way across another's land for five years is negatived by proof that claimant used the way in common with others.
9. EASEMENTS—RIGHT OF WAY—USE IN COMMON WITH OWNER AND OTHERS.
   Where the owner of premises uses a way, its enjoyment and use by another in common with the public generally must be regarded as being by permission and under an implied license, and not adverse, unless there be some decisive act on the part of that other to indicate a separate and exclusive use under claim of right.

APPEAL from the Second Judicial District Court, Washoe County; *John S. Orr*, Judge.

Action by M. J. Howard and another against John Wright and another. From judgment for defendants and denial of new trial, plaintiffs appeal. **Reversed and remanded.**

*Mack, Green, Brown & Heer*, for Appellants.

*W. A. Massey*, for Respondents.

By the Court, MCCARRAN, J.:

This is an appeal from a judgment and decree of the district court of the Second judicial district, by which judgment and decree a right of way across the property of the plaintiff Howard was declared in favor of the defendant John Wright; the right of way being described as a strip of ground theretofore traveled by the defendants and others, commencing at the first gate south of the corral of respondent to the plaintiff Howard's ranch upon the east side of that certain highway leading from Reno, Nevada, to Carson City, Nevada, and extending easterly from said gate to and across the lands of plaintiff, Mrs. M. J. Howard, to that certain gate in the partition fence between the lands of Howard and Wright, which gate is situated near the barn of said defendant John Wright, said right of way being twenty feet in width and as theretofore traveled by the said defendants and others. In addition to this a perpetual injunction was issued against the plaintiff Howard whereby the plaintiff was

enjoined from closing up, obstructing, or in any way interfering with the right of way described, so as to prevent a free and undisturbed use of the same by the defendant Wright.

The decree rendered by the trial court in this case grew out of an action wherein the plaintiff Howard and her lessee sought to secure a perpetual injunction against the defendant Wright, restraining the defendant from trespass or entry upon the lands of plaintiff. A temporary injunction was granted plaintiff upon the filing of her complaint. Together with the injunctive relief, plaintiff sought to recover damages against the defendant in the sum of $300 for trespass alleged to have been committed by the defendant Wright and his servants upon the premises of plaintiff. The premises on which the trespass is alleged to have been committed is a field owned by the plaintiff Howard, bounded on the west by the Virginia road, a public highway leading from the city of Reno to Virginia City, and bounded on the east by a fence which separates the field from the premises and property of the respondents Wright. It is the contention of respondents that a right of way through and across the field has been acquired by them by prescription, inasmuch as they have for many years past and in fact, as the record discloses, since the date of respondent's first occupancy of their premises, to wit, on or about 1863, passed across and over the field in question without asking for or receiving permission from the owners of the field.

It is not the contention of the respondents that this is the only avenue by which they can gain access to their premises. In fact, the record shows that another road exists which is the usually traveled road, but which makes the distance somewhat longer in going to or coming from the city of Reno. It is disclosed by the record that the appellant Howard purchased the premises in question from Gregory and Dresler, and that she, together with her husband, took up occupancy on the place April 10, 1867, and in her testimony, given at the trial, she nowhere

denies that the respondent Wright and his family, as well as others who had business at the Wright ranch, passed across her field in an easterly and westerly direction, first entering the field at the gate immediately in front of her house, passing across the field to the gate in the vicinity of the Wright residence. She nowhere contends that permission was ever asked by the respondent or any of his family to pass through the original gate and across this field, nor does she contend, in her testimony, that she ever questioned the right of respondents to pass across the premises. It appears from the record that the way in question was one marked by several bridges crossing artificial and natural waterways, running through the fields. It appears that there was no well-defined track or road, other than that which was marked by these bridges, and at one place in the field some work had been done in the way of grading. This work was done by the respondents Wright or those under them. The testimony of the respondent Wright, as well as that of his son, discloses that in the year 1890 he asked for and obtained permission from appellant to change the position of the gate entering into the field from the Virginia road. This fact is also testified to by the appellant. Pursuant to permission thus granted, the entrance formerly used by the Wrights on the occasions when they crossed the field was abandoned by them, and a gate was put in by respondent at a point about fifteen rods further south. This gate was used as a place of entrance by the respondent and the members of his family from the year 1890 up to a short time before the commencement of this case, at which latter date the respondents' lessee fastened the gate with a chain and locked the same. From the record it is disclosed that many others, in addition to the respondent and his family, entered the Howard field and crossed the same, some going to the Wright ranch and others to adjoining ranches, and still others to the mountain ranges lying to the eastward.

One principal question is presented for determination in this case, viz, Was the right to cross the Howard field

originally obtained by permission, either implied or expressed? In considering this question in connection with the facts presented a secondary question is involved. If the right to cross the Howard field was not originally acquired by permission, either expressed or implied, was it acquired adversely to the appellants or their predecessors in interest? The first question is one depending upon the facts presented; the second depends largely upon the acts and conduct of the respondents.

[1] At the outset it must be observed that it is a rule of law almost universally recognized that a permissive use to the premises of another for any length of time confers no rights to continued enjoyment. The owner may prohibit the use or may discontinue it altogether at his pleasure as long as it is merely permissive. (*Roe* v. *Walsh*, 76 Wash. 148, 135 Pac. 1031, 136 Pac. 1146; *Nellis* v. *Countryman*, 138 N. Y. Supp. 246; *Really* v. *Really*, 245 Mo. 417, 151 S. W. 415; 14 Cyc. 1151.)

[2] If the right is one adverse to the owner of the servient estate, then it must appear that the elements requisite to make out an adverse user are present. These elements are: First—The possession must be by actual occupation open and notorious, not clandestine. Second —It must be hostile to the title of the owner of the servient estate. Third—It must be held under a claim of title, exclusive of any other right as one's own. Fourth—It must be continuous and uninterrupted for a period of five years prior to the commencement of the action. (*Anthony* v. *Kennard Bldg. Co.*, 188 Mo. 704, 87 S. W. 921.)

In order to perfect an easement by occupancy for five years, the enjoyment must be adverse, continuous, open, and peaceable.

Nothing less than an adverse user, under claim of legal right, will perfect an easement by occupancy for the statutory time. A use acquired merely by consent, permission, or indulgence of the owner of the servient estate can never ripen into a prescriptive right, unless the user of the dominant estate expressly abandons and

denies his right under license or permission, and openly declares his right to be adverse to the owner of the servient estate. (*Hurt* v. *Adams,* 86 Mo. App. 73.)

In the latter case, his adverse right must be openly declared and continuously pursued for the period prescribed by the statute in which a prescriptive right may be acquired. (*Cobb* v. *Davenport,* 32 N. J. Law, 369; *Swango* v. *Greene,* 155 Ky. 227. 159 S. W. 692.)

The rule that precludes a permissive use from ripening into a right to continued enjoyment, where the permission, consent, or license is expressly given is no less effective where the permission or license may be implied. (*Thomas* v. *England,* 71 Cal. 456, 12 Pac. 491.)

[3] The facts as presented by the evidence in this case disclose two significant incidents when viewed in the light of the foregoing observations as to the law. The one is the user by the respondents of the original gate at the west terminus of the claimed way. The other, the user of the gate at the west terminus after the change made by request of respondents in 1890.

It is admitted by all parties in the record, familiar with the past history of the Howard field, that the premises were originally taken up and at least partially fenced by Gregory and Dresler, on or about the year 1862. The farm house constructed by Gregory and Dresler was in approximately the same position as that now occupied by the appellants, being on the west side of the Virginia road and opposite to the field over which the right of way is claimed. East of the Howard field was a tract of land located by the respondent Wright, and other tracts in the same vicinity were taken up by Clow, Smith, Savage, and others, who on numerous occasions, according to the testimony of the respondent Wright, passed through the Howard field by way of the original gates mentioned.

It is disclosed by the testimony of the respondent John Wright, Sr., that the Howard field in question was fenced and inclosed prior to the time at which Howard obtained

possession thereof, and while it was under the control and ownership of Gregory and Dresler; and, bearing upon the question of implied consent given by the original owners of the field to the respondent Wright, the testimony of Gregory is significant. He says that he came to the place to live for the first time in the spring of 1860, and lived there until about 1867; that about that time he sold the place to Howard and Goodwin. He testifies that soon after going to the place, and probably in the year '62 or '63, he inclosed, or at least partially inclosed, the field in question with a fence, and, referring to the original gate leading into the west side of the field from the Virginia road opposite the Howard house, he testified:

"Q. Now did you construct any gate leading from your place into the field or from the road into the field? A. Yes, sir; we had a gate.

"Q. Whereabouts was that gate built? A. Well, the gate, I do not recollect exactly, but somewheres, somewheres opposite the house where I lived.

"Q. Just about opposite the house? A. Somewheres in there.

"Q. Did it lead into a corral or stockyard or field? A. Well, of course, the gate went into the meadow, into the field.

"Q. Can you state about what time that gate was built by you? A. Well, I don't know.

"Q. Was it soon after you went there, or was it before, or how long a time after you went there? A. Well, it was some time, I think, after I first went there, probably '62 or '63 somewhere. * * *

"Q. Now, then, for what purpose did you build this gate that was opposite your house there leading into your field? A. What purpose?

"Q. Yes. What was the object in constructing the gate there? A. Well, I wanted the gate for my own use, a gate into my field.

"Q. Now, did any of your neighbors use that gate at any time to your knowledge? A. Yes.

"Q. Who were they? A. Well, there was Mr. Wright, he used it to go through there, and Mr. Clow and Mr. Smith used to live there, and others.

"Q. Now, did you make any objection to their using the gate? A. No, I never made any objection while I was there.

"Q. Why not? A. I couldn't say exactly, I only just let them go through as neighbors, something that way.

"Q. The relations between you and Mr. Wright were friendly or unfriendly; how were the relations between you and Mr. Wright? A. Well, we and Mr. Wright was always on good terms, never had any trouble with him.

"Q. Did Mr. Wright ever pay you anything for the privilege of using this gate or this road that the gate led into? A. No, sir."

The gate here referred to was originally the gate at the west terminus of the claimed right of way.

Nothing appears from the record in this case that would indicate that the respondents, or any person other than Gregory, either demanded the placing of the gate in the position in which it was originally placed by Gregory or had anything to do with its construction or maintenance. As disclosed by the record, the original gate, from the Virginia road into the Howard field, was used as a place of entrance into that field by Gregory, the original owner, and also by the Howards. It was also used by other parties whose convenience it suited to take a near cut to the Wright ranch, or other places in that vicinity.

[4] It is our judgment that the law in this respect is well established that where the owner of land opens a road across it for his own use, and keeps it open for his own use, the fact that he sees his neighbor, or other parties, also making use of it under circumstances that do not tend to injure the road or interfere with his own use of it, will not justify the inference that he is yielding to his express claim of right, or that his neighbor is asserting any right. (*Anthony* v. *Kennard Bldg. Co.*, 188 Mo. 704, 87 S.W. 921; *Harkness, et al.*, v. *Woodmansee*, 7 Utah, 227, 26 Pac. 291.)

The circumstances surrounding the user of the gate testified to by Gregory as being the original opening through which the respondent Wright passed, indicating, as they do, to our mind that such user was as consistent with the idea of permission as they were with adverse claim, the burden was with respondent to establish his adverse claim by something more than the mere passage over the land for the time testified to, even with the knowledge of the appellants and their predecessor. As was stated in the case of *Anthony* v. *Bldg. Co.*, *supra*, mere use of a passage over another's land for a long time with his knowledge is not necessarily an adverse use. The circumstances may be such as to authorize an inference that the use is adverse, but they may also be such as to intimate that the use was by permission. The use necessary to create or establish an easement by prescription, as we have already stated, must be adverse and under claim of right. It is true that these elements may be inferred from the circumstances, but they cannot be inferred, unless the circumstances justify the inference. We find nothing in the record with reference to the placing of the gate by Gregory, at the place which afterward became the west terminus of the claimed right of way, from which act it could be inferred that it was placed there by the witness in recognition of the right of others to pass through, or that respondents in passing through the gate did so in any other spirit than that of the recognition of a neighborly courtesy.

The record discloses that the appellants, as well as their predecessor, Gregory, knew that the respondent, Wright, and the members of his family, as well as others, passed through the gate and across the field to the Wright ranch, but this fact does not even raise a presumption that the act of the respondents in passing across the field was hostile or under claim of right. (*Tarpey* v. *Veith*, 22 Cal. App. 289, 134 Pac. 367.)

A right of way by prescription can only be acquired by a user which is neither expressly nor impliedly licensed or permissive. It must be adverse and hostile to the

owner of the servient estate, and must be under a claim of right so expressed as to charge the owner of the servient estate with knowledge thereof. (*Tarpey* v. *Veith, supra; Bowman* v. *Lee,* 48 Mo. 335; *Heckescher* v. *Cooper,* 203 Mo. 278, 101 S. W. 658; *Clay* v. *Penzel,* 79 Ark. 5, 94 S. W. 705.)

"User alone," says the Supreme Court of California in the very recent case of *Tarpey* v. *Veith, supra,* "is not sufficient to establish a prescriptive right of way over lands of another. Such user must be accompanied by a claim of right communicated to the owner of the land, or it must be shown that the user was so continuous and so openly and notoriously adverse to the owner as to create a presumptive knowledge in the owner that the person using the land was doing so under a claim of right. (Jones on Easements, sec. 266.)"

In the case of *Tarpey* v. *Veith, supra,* the Supreme Court of California quoted approvingly from the case of *Dexter* v. *Street,* 117 Ill. 532, 6 N. E. 506, wherein that court held: "The use must have been enjoyed under such circumstances as will indicate that it has been claimed as a right, and has not been regarded by the parties merely as a privilege revocable at the pleasure of the owner of the soil."

There is nothing in this case, so far as the record discloses, that even indicates an act on the part of the respondent, or the members of his family, from which act a claim of right might have been inferred by appellants. As disclosed by the testimony of both appellants and respondents, and by the testimony of the members of their respective families, a most cordial and neighborly feeling existed from the early pioneer days until the commencement of this suit. The neighborly feeling was reciprocal. Friendly visits appear to have taken place between the members of the respective families. In fact, as appears from the record, the entire community, during the time at which others, namely, Barney Clow, Hank Smith, Glenn Savage, and Grove Holcomb, resided there, together with appellants and respondents, appears to have

been one of most reciprocal neighborly spirit, in which the respective parties passed through the inclosures and over the fields of their neighbors on occasions when it suited their pleasure or convenience, either for interchange of courtesies, or on business.

[5] The road in question across the Howard field, and the gates at both termini were used more or less generally by those living in the vicinity, and were also used by the appellant Howard on occasions when she saw fit to visit respondents. The recognized rule of law is that where the owner of the land over which the way is claimed also uses such way, no adverse right can exist. (*Wood* v. *Reed,* 30 N. Y. Supp. 112; *Reid* v. *Garnett,* 101 Va. 47, 43 S. E. 182; *Williams* v. *Kuykendall,* 151 S. W. 629.)

[6] The gate, leading from the Howard field into the Virginia road, was, according to the record, placed there by Gregory, one of the predecessors of the appellant Howard, and there is nothing in the record, as we find it, that would indicate that the placing of the gate at that particular point was for any other purpose than that testified to by Gregory, namely, for his own use in entering the field. This gate was at the west terminus of what is declared by the respondents to be their right of way, but, as we view it, no way would ever have existed across the Howard field at that particular place had it not been for the placing of the gate there by Gregory. Gregory placed the gate there and Gregory and his successors in interest, the appellants herein, maintained the gate at that place, and, so far as we can determine from the record, the gate is still maintained at that place by appellants.

In our judgment, the fact that the appellants, or their predecessors, construed and maintained a gate on the west line of their field in no wise indicates a surrender or acquiescence on their part. On the contrary, all the facts surrounding the placing of the gate and its maintenance evidence a different attitude. (*Scheller* v. *Pierce County,* 55 Wash. 298, 104 Pac. 277; *Schulenbarger* v. *Johnstone,* 64 Wash. 202, 116 Pac. 843, 35 L. R. A. n. s. 941.)

In the case last cited, the Supreme Court of Washington said: "If there are any acts which indicate the intention of the owner of the soil to reserve the control to himself, like the erection of a fence and gate, it cannot be said that the intention is established; and the road does not become a highway however long it may have been used, even beyond the period of twenty years. Such permissive use, in the absence of any intention to dedicate, is but a mere license, which may be revoked at the pleasure of the owner."

A general rule, gathered from the decision of courts passing upon this subject, is to the effect that the leaving of gates or bars across a way will operate to rebut the presumption of adverse user rather than otherwise.

Some time after the appellants came into possession of the field in question, a barnyard corral was constructed, and the gate mentioned in the testimony of Gregory became the west entrance to that corral. This corral and the gate in question were used by the appellants for the purposes for which such inclosures are constructed. The respondents, on occasions when use was made of the way across the Howard field, passed through this barnyard, in order to get out onto the Virginia road. Others who had occasion to visit the Wright ranch also passed through this gate and barnyard. The principal user of the gate was appellant Howard, using the barnyard as she did for all general purposes. In our judgment the gate originally placed on the west line of the Howard field by Gregory, the original owner, and maintained there by Gregory and his successors in interest, the appellants herein, was as much a part of the claimed right of way as any other designated place in the field, and unless this passageway, through the west line fence of the Howard field, was used by respondents openly, notoriously, and under claim of right adverse to the appellants, we are unable to see how a prescriptive right to the use of this passageway could be maintained by respondent. In our judgment, the very fact that this

gate was used by appellants as an entrance to their own barnyard precludes the idea of a prescriptive right in favor of respondents. This is especially true when viewed in the light of the rule of law that no right of way through the premises of another can be acquired by user of a way maintained by the owner of the premises for his own convenience. (*Wood* v. *Reed, supra; Reid* v. *Garnett, supra.*)

In the light of our observations heretofore made the conclusion necessarily follows that the use of the original gate on the west line of the Howard field by the respondents was a use acquired by implied permission, and, there being no evidence in the record which would lead us to believe that the user was ever declared by respondents to be a right, or that any such contention was ever brought to the knowledge of appellants, or could reasonably have been inferred by appellants, such user could not and did not ripen into a prescriptive right.

According to the testimony of the respondents, as well as the testimony of appellants, the respondent, about the year 1890, asked permission of appellant Howard, and obtained her permission, to make a new gateway some fifteen rods south of the original gateway. The record discloses that this new gateway has been used from time to time by respondents, and that since the change respondents have not used the original gateway. It being our conclusion that the original gateway was used by respondents under implied permission, and that no right of way was acquired thereby, certainly their rights could not be strengthened by the permission admittedly given to the use of the new gateway, and the authorities heretofore cited abundantly support our contention in this respect.

[7] The fact that the respondents constructed and maintained some bridges across natural and artificial waterways in the Howard field along the general course of the way contended for, and did some grading and used the way more frequently than others, are not such acts as necessarily indicate adverse claim of right, when

considered in connection with all the other facts and circumstances in the case. (*Reid* v. *Garnett, supra; Long* v. *Mayberry,* 96 Tenn. 378, 36 S. W. 1040.)

It has been held by this court in the case of *Chollar-Potosi Mining Co.* v. *Kennedy,* 3 Nev. 361, 93 Am. Dec. 409, that a person assuming to have a right of way and continuously exercising that right for a period of five years, without consulting the owner of the soil or asking his permission, must be considered as holding adversely. This presumption, however, does not prevail where the circumstances are such as to show that the user was by permission. (*Bruner Granitoid Co.* v. *Glencoe Co.,* 169 Mo. App. 295, 152 S. W. 601.)

[8–9] Moreover, the presumption of a right arising from the unexplained use of a way over the land of another for a period of five years is negatived by proof showing that the claimant used the way in question in common with others. Where the owner of premises uses a way, its enjoyment and use by another in common with the public generally must be regarded as being by permission and under an implied license, and not adverse, unless there be some decisive act on the part of that other to indicate a separate and exclusive use under claim of right. (*Reid* v. *Garnett, supra.*)

The entire record, in this case relied upon by respondents to establish a right of way through the premises of appellant, typifies the general conditions and the general attitude of the pioneer of this section. To our mind it shows nothing more than the usual neighborly accommodation where, for convenience, one neighbor uses the premises of another and, in the spirit of hospitality, the other either welcomes him or remains silent. To apply to these conditions either adverse intent on the part of the user, or acquiescence to the extent of recognizing a right on the part of the one whose premises are used, would be to put a penalty upon generosity and destroy the neighborly spirit wholesome to such communities.

It follows that the judgment of the trial court and the

Points decided

---

order denying a new trial must be reversed and the case remanded.

It is so ordered.